CYR, Senior Circuit Judge.
 

 Chapter 7 debtor John E. Pearson seeks to set aside a bankruptcy court order which dismissed his motion for relief from a compromise settlement of all chapter 7 estate claims against First N.H. Bank (“First Bank”) following its affirmance by the district court on intermediate appeal. See Fed. R. Bankr.P. 9024. Pearson contends that the compromise settlement was the product of a fraud perpetrated upon the bankruptcy court by his former chapter 7 counsel, the chapter 7 trustee, and First Bank.
 

 We vacate the district court judgment and remand to the bankruptcy court for further proceedings.
 

 I
 

 BACKGROUND
 

 In January 1985, Pearson and the Tam-posi family (“the Tamposis”) formed Bradford Woods, Inc. (“BWI”), to develop and market condominiums in Merrimack, New Hampshire. Pearson and the Tamposis owned one-half interests in BWI, which obtained its construction financing from First N.H. Mortgage Corp. and First Bank. First Bank’s counsel, Wadleigh, Starr, Peters, Dunn & Chiesa (“Wadleigh Firm”), prepared the BWI loan documentation, including the personal guaranties provided to First Bank by Pearson and the Tamposis.
 

 When the New Hampshire real estate market soured in 1989, First Bank declined to accommodate BWI’s requests to restructure the loan. After the Tamposis rejected Pearson’s proposal that each contribute more capital to keep BWI afloat, or that BWI file a chapter 11 petition, Pearson retained William Gannon, Esquire, a Wadleigh Firm partner, to commence a civil proceeding in New Hampshire Superi- or Court (No. 89-E-1231) for a declaratory judgment directing the Tamposis to submit the Pearson proposal to arbitration under the terms of their joint venture agreement.
 

 First Bank called the BWI loan in November 1989. Although First Bank notified BWI, Pearson, and the Tamposis of the foreclosure sale in April 1990, the Tamposis, who were represented by the Wadleigh Firm, interposed no opposition. Instead, through the Wadleigh Firm and with First Bank’s cooperation, the Tampo-sis incorporated Spring Pond Development Corp. (“Spring Pond”), which proceeded to acquire the BWI condominium units at the foreclosure sale. First Bank provided the mortgage financing for the customers to whom Spring Pond resold the BWI condominium units. First Bank also assigned to the Tamposis the $498,595.81 liability Pearson had incurred with First Bank pursuant to his personal guaranty of the BWI construction loan made by First Bank.
 

 The BWI condominium foreclosure sale was followed by a succession of lawsuits. First, in October 1990 Pearson brought a
 
 pro se
 
 action against First Bank, the Tam-posis, and Spring Pond in New Hampshire Superior Court (No. 90-E-1082), alleging that First Bank and the Tamposis had
 
 *33
 
 utilized the BWI foreclosure action part of a conspiracy to deprive him of his 50% interest in BWI, in violation of the fiduciary duties the Tamposis owed BWI. In addition to demanding compensatory and punitive damages, Pearson sought to set aside both the BWI foreclosure sale and his personal guaranty of the First Bank loan to BWI.
 

 Next, in December 1990 the Tamposis brought suit against Pearson in New Hampshire Superior Court (Nos. 90-E-1263
 
 &
 
 1264) to recover the $498,595.81 due under the personal loan guaranty given by Pearson to First Bank and later assigned to the Tamposis by First Bank. Following the objections interposed by the Tamposis to the Wadleigh Firm’s appearance as Pearson’s counsel, the Wadleigh Firm withdrew from these actions, citing “the involvement of [First Bank] in the Bradford Woods foreclosure” as posing “potential conflicts of interest.”
 

 In April 1992, Pearson, represented by Attorney Gannon, filed for chapter 7 relief. Gannon submitted an application for appointment as chapter 7 counsel for Pearson, together with the required verified statement that Gannon had “no connections with the Debtor’s
 
 [ie.,
 
 Pearson’s] creditors or any party in interest, their respective attorneys, and accountants.”
 
 See
 
 Fed. R. Bankr.P.2014(a). Although the chapter 7 schedules Gannon prepared for Pearson listed both First Bank and the Tamposis as creditors, no mention was made of any conflict-of-interest claim Pearson may have held against the Wadleigh Firm.
 

 In September 1994, the chapter 7 trustee submitted an application for authorization to employ Attorney Gannon as special counsel for the Pearson chapter 7 estate, to litigate all estate claims other than those involving First Bank itself. In another verified statement submitted pursuant to Bankruptcy Rule 2014(a) shortly thereafter, Gannon represented to the bankruptcy court: “In [my] opinion, there is no conflict of interest which prevents [me] from acting as Special Counsel to the Trustee ... since the Special Counsel is not being retained to represent the Trustee in connection with the claims asserted against Bedford (sic) Woods and First N.H. Banks, Inc. where [the Wadleigh Firm’s] representation of Spring Pond Development would create a conflict of interest.” Once the application had been approved by the bankruptcy court, Gannon proceeded to settle all chapter 7 estate claims against the Tamposis.
 

 On October 12, 1995, after experiencing difficulty in retaining counsel to litigate the chapter 7 estate claims against First Bank, the chapter 7 trustee submitted an application to appoint Gannon as special counsel to the chapter 7 estate for that purpose as well. Although Gannon acknowledged that the Wadleigh Firm had incorporated Spring Pond, he represented to the bankruptcy court that the recent settlement with the Tamposis had “eliminate[d] any conflict of interest as between Pearson and the Tamposi Defendants.” Gannon further explained: “Since the Pearson-Tamposi conflict has been resolved and the Wadleigh Law Firm never represented [First Bank] in connection with any of the events referred to in the Damage Complaint or acquired any insight or knowledge from its representation of [First Bank] in other matters which would prejudice its former client in the State Court Suit, it believes that it can properly represent the Trustee in this Case.”
 

 The application to appoint Gannon special counsel to the chapter 7 estate was approved by the bankruptcy court on the following day in an
 
 ex parte
 
 order. Shortly thereafter, First Bank objected to the Gannon appointment on conflict-of-interest grounds and Gannon in turn moved to vacate the
 
 ex parte
 
 order of appointment pending hearing.
 

 Three days before the scheduled hearing on the chapter 7 trustee’s motion to appoint Gannon as special counsel, First Bank and the chapter 7 trustee arrived at
 
 *34
 
 an agreement to compromise all chapter 7 estate claims against First Bank. At that point, Gannon and the chapter 7 trustee withdrew, as moot, the motion to appoint Gannon special counsel to prosecute all chapter 7 estate claims against First Bank.
 

 Several months later, on March 28, 1996, the bankruptcy court approved the compromise settlement jointly proposed by First Bank and the chapter 7 trustee, whereby First Bank would pay the chapter 7 estate $40,000, and the chapter 7 estate in turn would release First Bank and its “parents, subsidiaries, affiliates, officers, directors, agents, employees, attorneys or representatives” from all liability. Following the compromise settlement with First Bank, Gannon ceased all representation of Pearson on the ground that a dispute had arisen between them regarding Gannon’s attorney fees. Thereafter, Pearson retained present counsel.
 

 Almost a year later, in February 1997, the chapter 7 trustee submitted a motion to abandon, as burdensome, certain chapter 7 estate property consisting of “[a]ny and all conflict of interest and breach of the duty of loyalty claims relative to the Wadleigh Law Firm and its attorney William S. Gannon, if any.”
 
 See
 
 Bankruptcy Code § 554, 11 U.S.C. § 554. First Bank promptly responded that the chapter 7 trustee’s motion proposed to abandon claims previously released in the March 28, 1996 compromise settlement between the chapter 7 estate and First Bank.
 

 At that point Pearson moved to vacate the March 28, 1996 compromise settlement between the chapter 7 trustee and First Bank,
 
 see
 
 Fed. R. Bankr.P. 9024, on the ground that the chapter 7 trustee had acted in concert with Gannon and First Bank to conceal Gannon’s conflict of interest from the bankruptcy court and thereby preclude Pearson from pursuing a malpractice claim against Gannon and the Wadleigh Firm.
 

 At a hearing held June 23, 1997, on (i) the chapter 7 trustee’s motion to abandon all chapter 7 estate claims against the Wadleigh Firm and Gannon, and (ii) Pearson’s Rule 9024 motion to set aside the March 28, 1996 order approving the compromise settlement between First Bank and the chapter 7 trustee, the bankruptcy court ruled that Pearson must prove “fraud on the court” by clear and convincing evidence. At the same time, it declined to allow either preliminary discovery or an evidentiary hearing unless and until Pearson first produced a “smoking gun” indicating that the chapter 7 trustee, the Wadleigh Firm, or First Bank, intended to conceal a conflict of interest material to the compromise settlement previously approved on March 28,1996.
 

 Thereafter, the bankruptcy court ruled that Pearson had not met its threshold “smoking gun” standard.
 
 In re Pearson,
 
 210 B.R. 500 (Bankr.D.N.H.1997). The district court affirmed in an unpublished opinion on intermediate appeal.
 

 II
 

 DISCUSSION
 

 On appeal from the district court, we review for clear error the factual findings made by the bankruptcy court; its conclusions of law are reviewed
 
 de novo. See Adams v. Coveney,
 
 162 F.3d 23, 25 (1st Cir.1998). A bankruptcy court order rejecting a motion to set aside a final compromise order under Bankruptcy Rule 9024 may not be disturbed on appeal absent an abuse of discretion.
 
 See, e.g., Golfland Enter. Ctrs., Inc. v. Peak Inv., Inc. (In re BCD Corp.),
 
 119 F.3d 852, 857 (10th Cir.1997).
 
 [1]
 

 
 *35
 
 Appellant Pearson contended below that these appellees (i) deliberately concealed from the bankruptcy court that Attorney Gannon had undertaken to represent the chapter 7 estate notwithstanding an irreconcilable conflict of interest
 
 (ie.,
 
 the Wad-leigh Firm’s previous representation of the Tamposis and First Bank); (ii) knowingly drafted the 1995 compromise expressly to release the Wadleigh Firm and its partners, Gannon and William Tucker, Esquire, from all potential legal malpractice claims by chapter 7 debtor Pearson; and (iii) maneuvered to preclude a bankruptcy court ruling on the conflict-of-interest issue as part of its March 1996 assessment of the compromise terms.
 

 At the hearing held on June 23, 1997, the bankruptcy court noted that normally the finality of compromise settlements in bankruptcy cases must be respected. The court then went on to rule that Pearson would be allowed neither the preliminary discovery nor the evidentiary hearing he had requested unless he first produced a “smoking gun” indicating that appellees had acted with intent to perpetrate a fraud on the court.
 

 Although the ultimate burden to prove “fraud on the court” by clear and convincing evidence rested with Pearson,
 
 see Aoude v. Mobil Oil Corp.,
 
 892 F.2d 1115, 1118 (1st Cir.1989), the bankruptcy court did not cite, nor have we found, any authority for invoking its “smoking gun” standard as a
 
 sine qua non
 
 for either preliminary discovery or an evidentiary hearing. On the contrary, whatever authority does exist suggests that once the record evidence demonstrates a “color-able” claim of fraud, the court may exercise its discretion to permit preliminary discovery and evidentiary proceedings.
 
 See, e.g., Hall v. Doering,
 
 185 F.R.D. 639, 644 n. 4 (D.Kan.1999) (fraud on the court);
 
 cf. also, e.g., Rothenberg v. Kamen,
 
 735 F.2d 753, 754 (2d Cir.1984) (settlement procured by fraud).
 

 In fraud cases, the “colorable claim” standard is more appropriate than the “smoking gun” standard because claimants who have been denied both preliminary discovery and an opportunity to present witnesses may well be left with no meaningful access to direct evidence of fraudulent intent, notwithstanding an abundance of telltale circumstantial evidence.
 
 [2]
 
 In such circumstances, trial courts must be vested with adequate discretion to determine in the first instance whether the particular facts warrant discovery and post-discovery proceedings.
 

 Accordingly, we now apply the “color-able claim” test, rather than the “smoking gun” standard, for determining whether the bankruptcy court abused its discretion in rejecting the Rule 9024 motion submitted by Pearson. To that end, we address
 
 seriatim
 
 the record evidence regarding: (1) the nature of the alleged conflict of interest; (2) appellees’ alleged concealment of any conflict from the bankruptcy court; (3) Pearson’s alleged waiver of any conflict of interest; and (4) the alleged harm caused the chapter 7 estate by appel-lees’ deception.
 

 A.
 
 Conflict of Interest
 

 In the event the Wadleigh Firm either formerly or concurrently represented in a substantially related matter an
 
 *36
 
 entity with an interest materially adverse to Pearson, the applicable ethical standards plainly prohibited any member of the Wadleigh Firm from representing Pearson in these bankruptcy proceedings.
 
 See
 
 New Hampshire Rules of Professional Conduct 1.7, 1.9, 1.10 [“NHRPC”].
 
 [3]
 
 Rule 1.9 contemplates careful inquiry into four factors: “First, there must have been a valid attornéy-elient relationship between the attorney and the former client. Second, the interests of the present and former clients must be
 
 materially adverse.
 
 Third, the former client must not have consented, in an informed manner, to the new representation. Finally, the current matter and the former matter must be the same or
 
 substantially related.” Sullivan Cty. Reg’l Refuse Disposal Dist. v. Town of Acworth,
 
 141 N.H. 479, 686 A.2d 755, 757 (1996)
 
 {“Acworth”)
 
 (emphasis added). It is clear from the record on appeal that the first, second, and fourth factors announced in
 
 Acworth
 
 obtained in the present case.
 

 In state court action No. 90-E-1082, filed in October 1990, Pearson alleged,
 
 inter alia,
 
 that the Wadleigh Firm had represented First Bank during 1985-86 in originating the BWI construction loan documentation, and that beginning in 1989 First Bank unlawfully conspired with the Tamposis and Spring Pond to deprive Pearson of his one-half interest in BWI. As regards the latter allegation, the bankruptcy court itself explicitly acknowledged that Attorney Gannon’s subjective view that he had not acted under any conflict of interest may have been “faulty,”
 
 Pearson,
 
 210 B.R. at 502; a candid characterization which inexplicably failed to receive due consideration in the
 
 ex parte
 
 order approving the chapter 7 trustee’s motion to appoint Attorney Gannon as special counsel.
 

 Thus, given the stark allegations made by Pearson in state court action No. 90-E-1082,
 
 see supra
 
 Section I, the Wadleigh Firm was precluded from undertaking to represent Pearson, either at the same time as or after representing the Tamposis and First Bank. Moreover, the record on appeal demonstrates that the Wadleigh Firm actually represented “materially adverse” interests in “substantially related” matters.
 
 See
 
 NHRPC 1.9(a);
 
 cf. Kevlik v. Goldstein,
 
 724 F.2d 844, 851 (1st Cir.1984),
 
 cited in
 
 NHRPC 1.7, 1.9 committee notes to decisions;
 
 cf. also Borges v. Our Lady of the Sea Corp.,
 
 935 F.2d 436, 439-40-(1st Cir.1991) (same). The Wadleigh Firm was representing First Bank when it originated the BWI loan documents, which included the First Bank loan guaranties executed by Pearson and the Tamposis. Pearson later brought suit against the Tamposis and First Bank seeking to have these same loan guaranties declared void (No. 90-E-1082), and the Tamposis later sued Pearson to recover the post-foreclosure deficiency due under Pearson’s First Bank loan guaranty (Nos. 90-E-1263 & 1264). Indeed, it is not unlikely that the Wadleigh
 
 *37
 
 Firm members who drafted these BWI loan documents could have been called as material witnesses in these actions.
 
 See
 
 NHRPC 3.7 (“A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness-”)•
 

 Second, the present record does not appear to support the bankruptcy court finding that William Tucker, Esquire, a Wad-leigh Firm partner, “was involved [only] in some fairly routine matters” involving BWI and the 1990 foreclosure.
 
 Pearson,
 
 210 B.R. at 503. Instead, Attorney Tucker served both as a First Bank director and a member of its Senior Lending Committee, which was charged with “ratifying] actions on existing loans.” Thus, presumably Tucker would have been entitled to vote on the Tamposis’ refinancing plan and on whether to call the BWI loan in 1989.
 

 Third, Spring Pond was established by the Tamposis and First Bank to acquire the BWI real estate at foreclosure, an integral element in the alleged conspiracy between First Bank and the Tamposis to deprive Pearson of his interest in BWI. Moreover, the Spring Pond articles of incorporation reflect that in April 1990 Attorney Tucker and another Wadleigh Firm partner incorporated Spring Pond Development Corporation.
 

 Fourth, Attorney Tucker served as a mediator between First Bank and the Tamposis’ counsel prior to the BWI foreclosure sale, when First Bank insisted that a potential problem with BWI’s real estate title be resolved as a prerequisite to any refinancing loan.
 

 Finally, Attorney Gannon explained in writing to Pearson in 1991 that the Wad-leigh Firm could not represent him in the civil action which the Tamposis filed against Pearson,
 
 see supra
 
 Section I, because the Wadleigh Firm’s earlier representation of First Bank gave rise to “irreconcilable professional conflicts.”
 

 Thus, the record plainly includes considerable evidence of serious conflicts of interest which could tend to divide Attorney Gannon’s loyalties, as between Pearson’s interests and the interests of Pearson’s creditors, particularly First Bank. At the very least, then, the record before the bankruptcy court preliminarily demonstrated a “colorable claim” that appellees either knew or had reason to know that any representation of Pearson by the Wad-leigh Firm in these chapter 7 proceedings was potentially conflicted.
 

 B.
 
 The Alleged Concealment of Conflicts of Interest
 

 We next consider whether Pearson established a colorable claim that appellees may have concealed a conflict of interest from the bankruptcy court. “ ‘[F]raud on the court’ occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system’s ability impartially to adjudicate a matter.”
 
 Aoude,
 
 892 F.2d at 1118,
 
 quoted in Fernandez v. Leonard,
 
 963 F.2d 459, 462 (1st Cir.1992);
 
 Pearson,
 
 210 B.R. at 501 (Fraud on the court is an “intentional deflecting of the Court from knowing all the facts necessary to make an appropriate judicial decision on the matter before it.”) (citing
 
 In re Tri-Cran,
 
 98 B.R. 609, 615-16 (Bankr.D.Mass.1989)).
 

 Pearson alleged as follows: Attorney Gannon knew that the Wadleigh Firm had represented Pearson, both before and after his chapter 7 petition was filed, despite an irreconcilable conflict of interest, and that if the conflict were disclosed Pearson would realize that he had a potentially lucrative malpractice claim against the Wadleigh Firm. Rather than assume the risk that Pearson might retain other counsel, who could discover the conflict, Gan-non continued to represent Pearson. Then, in October 1995, Gannon sought appointment as special counsel to the chapter 7 estate, with a view to negotiating a settlement which would release the Wadleigh Firm from any liability, either to Pearson or the chapter 7 estate, arising out of the
 
 *38
 
 BWI matter. When First Bank objected to the Gannon appointment, Gannon ostensibly withdrew as special counsel but continued to participate in the settlement negotiations.
 

 Notwithstanding these allegations, the bankruptcy court ruled that since Gannon was not representing the chapter 7 estate, Bankruptcy Rule 2014 did not require him to make any such disclosure.
 
 See Pearson,
 
 210 B.R. at 503. The record on appeal itself plainly demonstrates, however, that (i) Pearson met the applicable “color-able claim” standard, and (ii) the bankruptcy court erred in failing to consider whether to exercise its discretion to authorize discovery and/or an evidentiary hearing.
 

 To begin with, Gannon failed to disclose the conflict of interest existing at the time he
 
 commenced
 
 his representation of Pearson
 
 qua
 
 chapter 7 debtor.
 
 See Rome v. Braunstein,
 
 19 F.3d 54, 57 (1st Cir.1994). Instead, he submitted the verified statement required under Fed. R. Bankr.P. 2014, which unequivocally asserted that there were no conflicts of interest which would prevent him from representing Pearson in the chapter 7 proceeding.
 

 The appellees respond that
 
 Rome
 
 is in-apposite, since it merely held that counsel representing a debtor estate must disclose such conflicts of interest. Their contention is without merit. Although
 
 Rome
 
 involved conflicts of interest by counsel employed to represent the debtor estate, neither
 
 Rome
 
 nor Bankruptcy Rule 2014 remotely suggests that conventional conflict-of-interest rules are inapplicable to
 
 other counsel
 
 in bankruptcy proceedings. Here, Attorney Gannon made an affirmative misrepresentation to the court, which did not comport with his duty of candor. See,
 
 e.g.,
 
 NHRPC 3.3(a)(1), comment (“There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation.”);
 
 In re Tri-Cran,
 
 98 B.R. at 616 (“ ‘Since attorneys are officers of the court, their conduct, if dishonest, would constitute fraud on the court.’ ”) (citation omitted);
 
 cf. Burns v. Windsor Ins. Co.,
 
 3Í F.3d 1092, 1095 (11th Cir.1994) (“Every lawyer is an officer of the court ... [and] he always has a duty of candor to the tribunal.”);
 
 United States v. Shaffer Equip. Co.,
 
 11 F.3d 450, 457 (4th Cir.1993) (“[A] general duty of candor to the court exists in connection with an attorney’s role as an officer of the court.”);
 
 cf. also Erickson v. Newmar Corp.,
 
 87 F.3d 298, 303 (9th Cir.1996) (“[I]t is th[e] court which is authorized to supervise the conduct of the members of its bar ... [and has] a responsibility to maintain public confidence in the legal profession.”).
 

 The record plainly reflects that Attorney Gannon did not simply remain silent, but instead submitted the verified statement required by Bankruptcy Rule 2014, asserting without qualification that he had “no connections” with any Pearson creditors. Furthermore, not only was the verified statement demonstrably false, but Gannon submitted chapter 7 asset schedules which failed to list potential conflict-of-interest claims against himself and the Wadleigh Firm. Whatever the precise dimensions of the duties of disclosure imposed upon counsel under the Rules of Bankruptcy Procedure, we cannot envision that they offer comfort for affirmative misrepresentations to the court itself.
 

 In a related vein, referencing the filings submitted in connection with the abortive attempt by the chapter 7 trustee in October 1995 to have Gannon appointed special counsel to litigate the chapter 7 estate’s claims against First Bank, the bankruptcy court observed that appellees’ willingness to make these factual disclosures belied any intent to deceive the court.
 
 See Pearson,
 
 210 B.R. at 501 (“[T]he facts of possible conflict were spread upon the record of this Court....”). As the record on appeal plainly reflects, however, in so doing the Wadleigh Firm assumed much less risk of exposure than would have obtained upon the filing of an accurate verified statement under Bankruptcy Rule 2014.
 

 
 *39
 
 First, as the bankruptcy court itself recognized, the disclosures made by the Wad-leigh Firm in 1995 were “not complete in all details.”
 
 Id.
 
 The motion to appoint Gannon as special counsel to the chapter 7 trustee asserted that the Wadleigh Firm represented First Bank in other cases of “debt restructuring and work outs,” but that it “did not represent [First Bank] in connection with its administration or collection of the loan made to Bradford Woods.” Although the motion to appoint Gannon as special counsel to the chapter 7 trustee acknowledged that
 
 the Wadleigh Firm incorporated Spring Pond,
 
 it failed to disclose that Pearson had alleged, in state-court complaint No. 90-E-1082, that
 
 Spring Pond was the vehicle employed to further First Bank’s alleged conspiracy with the Tamposis.
 

 Second, the application for the appointment of Gannon as special counsel, filed in October 1995 by the chapter 7 trustee and Gannon, represented in conclusory fashion to the bankruptcy court that Gannon’s recent settlement of the chapter 7 estate’s claims against the Tamposis “eliminate[d]” any conflict which might otherwise have prevented the Wadleigh Firm from representing the chapter 7 estate. Yet even now the Wadleigh Firm articulates no plausible explanation for ascribing such curative effect under any fair reading of the governing ethical rules,
 
 see supra
 
 Section H.A., given the fact that the Wadleigh Firm’s conflicts of interest
 
 persisted after the settlement with the Tamposis.
 
 Indeed, this very point was forcefully made by none other than
 
 First Bank,
 
 in its opposition to the chapter 7 trustee’s motion to appoint Attorney Gannon as special counsel to the chapter 7 estate.
 

 The assessment made by the bankruptcy court- — -that it was enough that appellees had “spread the facts on the record”— likewise misses the mark. The motion to appoint Gannon as special counsel to the chapter 7 trustee was granted
 
 ex parte
 
 by the bankruptcy court the day after it was filed by the chapter 7 trustee. But when First Bank interposed its objection, the chapter 7 trustee and Gannon promptly requested that the bankruptcy court summarily vacate its
 
 ex parte
 
 appointment of Gannon and schedule the matter for hearing. Whereupon a compromise was reached before the hearing could be held, and Attorney Gannon then proposed that the bankruptcy court cancel the scheduled hearing as moot. Thereafter, at the hearing held to consider the newfound compromise, neither First Bank nor the chapter 7 trustee adverted to the conflict-of-interest issue, neither Attorney Gannon nor Pearson appeared, and the bankruptcy court neither focused nor ruled on the matter.
 

 Moreover, even assuming Attorney Gan-non had no affirmative obligation to disclose the conflict of interest at the time the chapter 7 case commenced, such a duty plainly would have arisen under the Bankruptcy Rules upon his appointment as special counsel to the chapter 7 estate. Indeed, the present record discloses additional evidence that appellees may have circumvented effective bankruptcy court oversight, thereby enabling Gannon to assume the role of
 
 de facto
 
 special counsel for the chapter 7 estate even after the bankruptcy court had vacated his
 
 ex parte
 
 appointment, and to exert influence in negotiating a release of any conflict-of-interest claims against the Wadleigh Firm: (i) a November 14, 1995, letter from First Bank’s counsel to Attorney Gannon stated: “As you know, the settlement
 
 we
 
 reached was
 
 conditioned,
 
 among other things, on no further resources needed to be expended preparing for the [upcoming] hearing [on Gannon’s appointment as special counsel].” (emphasis added); (ii) the same letter from First Bank reminded Attorney Gannon that he had “agreed” to contact the bankruptcy court to withdraw the
 
 ex parte
 
 motion seeking his appointment as special counsel to the chapter 7 estate.
 

 The November 14, 1995, letter from First Bank advised Gannon that the withdrawal of the
 
 ex parte
 
 motion for his appointment as special counsel to the chapter
 
 *40
 
 7 trustee was a negotiated
 
 condition
 
 of the settlement, and further suggested — in its reference to “we” — that appellees may have regarded Gannon as an active participant in the settlement negotiations.
 
 [4]
 

 Although the November 15 motion to withdraw the
 
 ex parte
 
 motion for Gannon’s appointment represented that the chapter 7 trustee and First Bank had “agreed” to the compromise, while noting that the compromise was “acceptable to the Debt- or,” the term “acceptable” is hardly unambiguous. On the one hand, it may have meant that Gannon and Pearson simply signed off on the compromise after the chapter 7 trustee and First Bank finished negotiating its terms. On the other hand, it may have meant that Gannon exercised some undisclosed influence in proposing and/or drafting the terms of the compromise, and that he participated in negotiating those terms.
 

 Attorney Gannon faxed First Bank’s counsel on February 13, 1996, proposing specific language for inclusion in the settlement agreement which would preserve First Bank’s allowed claims against the chapter 7 estate to the extent the chapter 7 trustee were ever to receive payment of any monies from International Explorations Ltd. (IEL), in which Pearson allegedly held a 2% interest. Appellees discount this evidence on two grounds: (i) Pearson admitted that his IEL interest was worthless, and (ii) First Bank simply requested that Gannon supply it with the name of the corporation (“IEL”) so that First Bank could insert the corporate name in a settlement provision previously negotiated between the chapter 7 trustee and First Bank. Neither response is conclusive.
 

 First, it is not clear from the present record what motive First Bank would have had to negotiate a settlement provision which preserved an interest it considered worthless. Second, and much more importantly, Gannon did not simply provide First Bank with IEL’s name; he attached the entire settlement provision to the February 13th communication, thereby suggesting that the Wadleigh Firm was not only actively proposing last-minute settlement terms, but that
 
 it ivas doing so to protect First Bank’s interests, rather than Pearson’s.
 

 Finally, the release contained in the final settlement agreement itself states that the chapter 7 estate is relinquishing all BWI-related claims against First Bank,
 
 its directors and attorneys.
 
 Notwithstanding the context, however, at the time it approved the chapter 7 trustee’s motion to abandon “[a]ny and all
 
 conflict of interest and breach of the duty of loyalty claims relative to the Wadleigh Law Firm and its attorney William S. Gannon, if any
 
 [,]” the bankruptcy court refused to determine the meaning or scope of the language employed in the final settlement release. (Emphasis added.) Instead, it simply concluded that there was no evidence of “devious intent” on the part of appellees.
 

 The bankruptcy court found that the Wadleigh Firm and Attorney Gannon had no “inkling” that Pearson might have viable malpractice claims against them, and therefore they could not have anticipated that the “boilerplate” release provision would absolve them from any such claims.
 
 Pearson,
 
 210 B.R. at 503. We are unable to discern the evidence upon which this finding is based. Nor are we persuaded, given the record evidence relating to the Wadleigh Firm’s conflicted interests in representing Pearson, First Bank, and the Tamposis,
 
 see supra
 
 Section I (No. 90-E-1082) & Section H.A., that the proffered release, objectively viewed in context, necessarily amounted to mere “boilerplate.” We briefly explain.
 

 
 *41
 
 The
 
 Wadleigh Firm,
 
 which served as First Bank’s
 
 “attorney,”
 
 and Attorney-Tucker, a Wadleigh Firm
 
 partner
 
 and First Bank
 
 “director”
 
 had every reason and occasion to be cognizant of their conflicted interests, and, therefore, that Pearson’s potential malpractice claims against all those covered by the “boilerplate” release, including themselves, might be barred by the release. Viewed in actual context, therefore, the terms of the “boilerplate” release provision itself may constitute probative evidence of a fraudulent intent which the bankruptcy court may revisit and scrutinize on remand.
 

 C.
 
 The Putative Waiver of ConMcts of Interest
 

 The bankruptcy court nevertheless ruled that even assuming a conflict of interest, Pearson either consented to representation by the Wadleigh Firm or acquiesced in perpetrating a fraud upon the court, since Pearson neither notified the bankruptcy court of the grounds giving rise to any conflict nor instructed Attorney Gannon to do so.
 
 See Pearson,
 
 210 B.R. at 502. The bankruptcy court noted as well that Pearson had encouraged, even badgered, the Wadleigh Firm into representing him, and only belatedly objected in 1996 when Attorney Gannon demanded that Pearson pay attorney fees.
 
 See id.
 
 at 502-03. We address these matters in turn.
 

 First, under the governing ethical rules, some conflicts of interest are considered so fundamental that even an anxious prospective client is deemed incapacitated from providing informed consent.
 
 See, e.g.,
 
 NHRPC 1.9;
 
 Kevlik,
 
 724 F.2d at 850-51. “ ‘[WJhen a
 
 disinterested
 
 lawyer would conclude that the client should not agree to the representation under the circumstances,
 
 the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client’s consent.’ ” Kelley’s Case,
 
 137 N.H. 314, 627 A.2d 597, 600 (1993) (quoting Comments, ABA Model Rule 1.7(b)) (emphasis added). In these circumstances, it is exceedingly difficult to envision that a disinterested attorney could have advised Pearson to consent to representation by the Wadleigh' firm given the circumstances alleged in Pearson’s state-court complaint.
 
 See supra
 
 Section I (describing allegations in No. 90-E-1082).
 

 Second, although we leave it to the bankruptcy court on remand to determine whether any conflict of interest was sufficiently serious to preclude its competent waiver by Pearson, the matter at issue went well beyond whether Pearson’s implied consent could be considered effectual, since Gannon did not simply remain silent concerning any potential conflict of interest. Rather, he presented to the bankruptcy court the unconditional representation that he had
 
 “no connections
 
 with [Pearson’s] creditors or any party in interest, their respective attorneys, and accountants,”
 
 see supra
 
 Sections I & II.B., rather than reporting that such connections did in fact exist, but that Pearson knowingly had waived any such conflict of interest. Whatever safeguards counsel may realize in remaining silent do not extend to deliberate efforts to mislead the court through inaccurate representations. Clearly then, the Wadleigh Firm and Attorney Gannon acted at their peril, and appellees may not ward off all discovery and a further evidentiary inquiry simply by resorting to conclusory assertions that Pearson consented.
 
 [5]
 
 The bankruptcy court should address these concerns on remand.
 

 
 *42
 
 D.
 
 The Harm, Caused by the Alleged Concealment
 

 As the bankruptcy court did not determine the value of the Pearson claims against the Wadleigh Firm, the record on appeal does not permit a determination as to whether, and if so to what extent, any such conflicts of interest may have affected the chapter 7 estate.
 
 [6]
 

 Ill
 

 CONCLUSION
 

 We therefore conclude that the factfind-ing process was prematurely suspended by the bankruptcy court’s decision to deny the Rule 9024 motion to set aside the compromise. As its decision constituted an abuse of discretion, given the evidence of serious conflicts of interest,
 
 supra,
 
 we remand to the bankruptcy court for further proceedings consistent with this opinion.
 

 We neither prescribe particular factfinding proceedings for use on remand, nor presuppose any assessment of the record evidence ultimately gathered. Finally, should it be determined that a fraud was perpetrated upon the bankruptcy court, it is within its discretionary power to tailor an appropriate remedy in the first instance.
 
 [7]
 

 The district court order is vacated and the case is remanded to the bankruptcy court for further proceedings consistent with this opinion. Costs to appellant.
 

 SO ORDERED.
 

 [1]
 

 . Bankruptcy Rule 9024 incorporates Fed. R.Civ.P. 60(b), which provides: “On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for ... any [ ] reason justifying relief from the operation of the judgment....
 
 This Rule does not limit the power of a court
 
 ... to set aside a judgment for fraud on the court.” Fed. R. Bankr.P. 9024 (emphasis added).
 

 [2]
 

 .
 
 See Kuiper v. American Cyanamid Co.,
 
 913 F.Supp. 1236, 1245 (E.D.Wis.1996) ("[I]n most fraud cases, ... plaintiffs rarely obtain possession of the ‘smoking guns' ... until a lawsuit is filed and discovery of the defendant’s internal records becomes available.”);
 
 Tew v. Chase Manhattan Bank, N.A.,
 
 728 F.Supp. 1551, 1555 (S.D.Fla.1990) (“Certain issues such as fraud, intent, and knowledge lend themselves to trial, rather than summary judgment. These matters can often only be proved by reliance upon circumstantial evidence except in the rare case where there is uncontroverted proof of a ‘smoking gun.' ”);
 
 Holden v. Burlington Northern, Inc.,
 
 665 F.Supp. 1398, 1424 (D.Minn.1987) (“Discovery was permitted in order to give objecting counsel every opportunity to reveal that 'smoking gun’ which would show that fraud and collusion had pervaded the settlement negotiations.”).
 

 [3]
 

 . Rule 1.7(b) provides, in pertinent part:
 

 A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer’s responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
 

 (1) the lawyer reasonably believes the representation will not be adversely affected; and
 

 (2) the client consents after consultation and with knowledge of the consequences. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.
 

 NHRPC 1.7(b). Rule 1.9(a) provides: "A lawyer who has formerly represented a person in a matter shall not thereafter: (a) represent another person in the same or a substantially related matter in which that client’s interests are materially adverse to the interests of both unless the former client consents after consultation and with knowledge of the consequences.”
 
 Id.
 
 Rule 1.9(a) (pre-June 1999 version). Rule 1.10(a) provides: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule[s] 1.7[and] ... 1.9.”
 
 Id.
 
 Rule 1.10(a).
 

 [4]
 

 . Appellees argue also that First Bank contacted Gannon about withdrawing the
 
 ex parte
 
 appointment motion merely because he had filed it. Since the record reflects that the motion had been signed by both Gannon and the chapter 7 trustee, however, it is not presently clear why First Bank could not simply have requested the chapter 7 trustee — the fiduciary with sole authority to pursue Gan-non's appointment — to withdraw the motion.
 

 [5]
 

 . As the party with the burden to prove fraud on the court by clear and convincing evidence, Pearson was faulted by the bankruptcy court for failing to appear at hearings held to approve and, later, set aside the compromise settlement, so as to make himself available for examination by the bankruptcy court. We disagree.
 

 Pearson's non-appearance at the initial hearing was altogether consistent with the representations made to him both by the chapter 7 trustee and Attorney Gannon: that only the chapter 7 trustee and First Bank were "parties'' to the compromise. Moreover, Pearson's absence from the second hearing is explained by the bankruptcy court’s
 
 *42
 
 earlier ruling that the hearing would be non-evidentiary unless Pearson's
 
 documentary submissions
 
 disclosed a "smoking gun.” Thus, since the Wadleigh Firm partners were not to testify, there was no reason for Pearson to anticipate that he should expect to be called to testily, nor was he.
 

 [6]
 

 . The bankruptcy court observed that it had been common in the 1980s for counsel to represent multiple parties in real estate joint ventures, after obtaining their consent.
 
 See Pearson,
 
 210 B.R. at 503. No matter how prevalent such practices may have been in the past, and notwithstanding any alleged perception that bankruptcy court fiduciaries — absent the prospect of financial benefit to the debtor estate — continue to display little concern for ethical lapses visited upon the court, it is not within the purview of a chapter 7 fiduciary to disregard the need to take reasonable steps to resist practices which may constitute fraud on the court.
 
 Id.
 

 We note, for the benefit of the bankruptcy court on remand, that the proper inquiiy is not whether such practices either were or remain efficient or commonplace, but whether counsel may engage in them without informing the bankruptcy court in the first instance.
 
 See In re Tri-Cran,
 
 98 B.R. at 615-16 ("fraud on the court” doctrine designed to protect integrity of the bankruptcy court).
 

 [7]
 

 . First Bank and the chapter 7 trustee contend that their compromise settlement was arrived at in good faith and that they ought not be penalized were it to be determined that the Wadleigh Firm unilaterally engaged in professional misconduct.
 
 See
 
 NHRPC 3.3(a) ("A lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substan- ■ tial question as to the lawyer’s honesty, trustworthiness or fitness as a lawyer in other respects shall inform the appropriate professional authority.”). In that vein, the bankruptcy court may determine that it is not appropriate to disturb the compromise, but nonetheless invoke its inherent powers to sanction any person found to have perpetrated a fraud on the court. The nature of any such sanction should be determined with a view to its deterrent value, not necessarily limited to the harm caused litigants.
 
 See John’s Insulation, Inc. v. L. Addison and
 
 As
 
 socs., Inc.,
 
 156 F.3d 101, 110 (1st Cir.1998) ("[T]he purpose of sanctions, moreover, is not merely to penalize violations of court procedures, but also to deter future violations by other parties, and thus sanctions do not have to be strictly proportional to the severity of a given party's violations.”).