2010 WY 126

Jack DOLLARHIDE, Appellant
(Plaintiff),

v.

Scott BANCROFT, Murray Shattuck,
and Michael Johnson, Appellees
(Defendants).

No. S–10–0023.

Supreme Court of Wyoming.

Sept. 14, 2010.

Representing Appellant: Weston W. Reeves and Anna M. Reeves Olson of Park Street Law Office, Casper, Wyoming. Argument by Ms. Reeves Olson and Mr. Reeves.

Representing Appellees: Richard A. Mincer of Hirst Applegate, LLP, Cheyenne, Wyoming; John A. Sundahl of Sundahl, Powers, Kapp & Martin, LLC, Cheyenne, Wyoming; L. Kathleen Chaney of Lambdin & Chaney, LLC, Denver, Colorado. Argument by Ms. Chaney and Messrs. Mincer and Sundahl.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

VOIGT, Justice.

[¶ 1] On August 3, 2001, while employed as a carpenter by Bancroft Construction, Inc., in Teton County, Wyoming, Jack Dollarhide (Dollarhide) was injured when the raised wooden platform upon which he was standing crashed to the ground. Dollarhide obtained benefits from the Wyoming Worker's Compensation fund, but also filed a co-employee liability action against Scott Bancroft (Bancroft), the owner of the company, and Murray Shattuck (Shattuck), the company's general construction superintendent. That action subsequently was consolidated with a similar action filed by Dollarhide against Michael Johnson (Johnson), the company's project superintendent.[1]

[¶ 2] After considerable delay, the first trial resulted in a mistrial due to certain comments made by Dollarhide's counsel during opening statements. The second trial resulted in a jury verdict in favor of Bancroft, Shattuck, and Johnson. In this appeal,

---

1. Wyo. Stat. Ann. § 27–14–104(a) (LexisNexis 2009) provides that the rights and remedies of the Wyoming Worker's Compensation Act are exclusive in certain suits by employees against employers and co-employees, "unless the employees intentionally act to cause physical harm or injury to the injured employee." This Court has equated the concept of "intentionally act to cause physical harm or injury" to the concept of "willful and wanton misconduct." *Bertagnolli v. Louderback,* 2003 WY 50, ¶ 15, 67 P.3d 627, 632 (Wyo.2003).

Dollarhide challenges the granting of the mistrial and assessment of costs resulting therefrom, and the denial of his motion for entry of default based upon a pretrial change in Johnson's testimony. Finding no error, we affirm.

## ISSUES

[¶3] 1. Did the district court abuse its discretion in granting Bancroft's motion for mistrial and assessing costs against Dollarhide?

2. Did the district court abuse its discretion in denying Dollarhide's motion for entry of default?

## STANDARD OF REVIEW

 [¶4] "The court's ruling on a motion for mistrial ... is reviewed for an abuse of discretion." *Espinoza v. State,* 969 P.2d 542, 546 (Wyo.1998), cert. denied, 528 U.S. 818, 120 S.Ct. 59, 145 L.Ed.2d 52 (1999); see also *Ross v. State,* 930 P.2d 965, 968 (Wyo.1996). " 'Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.' " *Vaughn v. State,* 962 P.2d 149, 151 (Wyo.1998) (quoting *Martin v. State,* 720 P.2d 894, 897 (Wyo.1986)); see also *Stroup v. Oedekoven,* 995 P.2d 125, 128 (Wyo.1999).

> In determining whether there has been an abuse of discretion, we focus on the "reasonableness of the choice made by the trial court." *Vaughn,* 962 P.2d 149, 151 (Wyo.1998). If the trial court could reasonably conclude as it did and the ruling is one based on sound judgment with regard to what is right under the circumstances, it will not be disturbed absent a showing that some facet of the ruling is arbitrary or capricious.

*Jordan v. Brackin,* 992 P.2d 1096, 1098 (Wyo.1999).

*Hannifan v. Am. Nat'l Bank of Cheyenne,* 2008 WY 65, ¶36, 185 P.3d 679, 693 (Wyo. 2008) (quoting *Terry v. Sweeney,* 10 P.3d 554, 557 (Wyo.2000)). We also review the grant-

ing of costs as a sanction under the same standard. *Goglio v. Star Valley Ranch Ass'n,* 2002 WY 94, ¶38, 48 P.3d 1072, 1085 (Wyo.2002); *Welch v. Hat Six Homes,* 2002 WY 81, ¶10, 47 P.3d 199, 202 (Wyo.2002); *Snyder v. Lovercheck,* 2001 WY 64, ¶6, 27 P.3d 695, 697 (Wyo.2001). Where egregious discovery abuse, or similar misconduct, has occurred, the discretion to impose sanctions may include the power to strike pleadings and to enter a default. *Stanley Shenker & Assocs. Inc. v. World Wrestling Fed'n Entm't, Inc.,* 48 Conn.Supp. 357, 844 A.2d 964, 973 (2003); *Pope v. Fed. Express Corp.,* 974 F.2d 982, 984 (8th Cir.1992); *Combs v. Rockwell Int'l Corp.,* 927 F.2d 486, 488 (9th Cir.1991).

## FACTS

[¶5] On August 3, 2001, Dollarhide was working for the company building a residence in Teton County. At some point on that date, he and another employee got onto a wooden platform fitted with guardrails, which platform—sometimes called a "man-basket"—was then raised approximately twelve to fifteen feet in the air on the tines of a forklift so the men could attach two beams to the ceiling. The man-basket came apart, and both men fell to the ground, with Dollarhide receiving serious injuries. These basic facts are not in dispute.

[¶6] Dollarhide sued Bancroft, the company's owner, and Shattuck, the company's general construction superintendent. Later, that lawsuit was consolidated with his separate suit against Johnson, the project superintendent. The gist of the cause of action against all three men was that they acted intentionally or in willful and wanton disregard of the known and obvious risks presented by elevating workers off the ground on a flimsy wooden platform. This being the central issue of the case, the two focal questions became whether such was the company practice, and if so, what each man knew about the practice prior to the accident.

[¶7] In their Answers to Dollarhide's Complaints, Bancroft, Shattuck, and Johnson generally denied the allegations, and specifically denied that Dollarhide was directed to use the man-basket. More significantly, in

support of a Motion for Summary Judgment, Bancroft and Shattuck relied upon their own affidavits, and Johnson's affidavit, to set forth, *inter alia,* the following "facts":

1. Before work began on the day of the accident, Johnson instructed the workers to use scaffolding to install the beams, and the workers verbally acknowledged such instruction.

2. Scaffolding was present at the job site for such purpose.

3. During Johnson's temporary absence from the job site, the workers decided on their own to use the wooden man-basket.

4. Neither Bancroft nor Shattuck was physically present at the job site on the date Dollarhide was injured, and neither man had any knowledge prior to the accident that company employees would use the wooden platform in the manner it was used.

5. Neither Bancroft nor Shattuck were ever advised by any employee that a dangerous condition existed because employees were using the wooden platform in the manner it was used.

6. In addition to the above statements, Johnson also specifically swore in his affidavit that the wooden platform was never intended to be used as it was being used when Dollarhide was injured, but was constructed for the sole purpose of transporting tools at the job site.

[¶ 8] This version of events had one central theme: it was not company policy or practice to use the wooden platform as a "man-basket," and Dollarhide was not authorized or instructed to use it in that manner. The defendants perpetuated this theme in affidavits, depositions, and other discovery responses. In support of his own Motion for Summary Judgment after he was brought in as a defendant, Johnson presented the same defense, and utilized many of the same discovery documents. In his deposition taken in 2008, he repeated the statements he made in his 2005 affidavit; that is, he claimed that not only had he not instructed Dollarhide to use the wooden platform as a man-lift, he had never seen any company employees elevated in a wooden platform.

[¶ 9] Without opining as to fault, we will simply say that the tortuous pretrial progress of this case is not a model to be followed.[2] The incident occurred on August 3, 2001. The first Complaint was filed on August 29, 2003. The discovery process, dispositive motions, changes in legal representation, a dismissal for failure to prosecute, and an appeal to this court caused considerable delay in getting to trial.[3] *See Dollarhide v. Bancroft,* 2008 WY 113, 193 P.3d 223 (Wyo. 2008) (reversal of the dismissal). Finally, the final pretrial conference was scheduled for April 20, 2009, and the trial was scheduled to begin on May 18, 2009.

[¶ 10] Just prior to the pretrial conference, the events that gave rise to the case in its present posture began to unfold. Citing "professional considerations" and Rule 1.16(a)(1) of the Wyoming Rules of Professional Conduct for Attorneys at Law, the defendants' attorneys moved on April 16, 2009, to be allowed to withdraw from the case.[4] That motion was granted, and several new lawyers appeared separately for the three defendants. The trial was reset for August 10, 2009. On May 26, 2009, Johnson's new counsel sent a "correction page" to all counsel and to the court reporter who had reported Johnson's deposition eleven months earlier. Set out below is Johnson's original deposition testimony, along with the change made to each pertinent answer:

Q. During the time that you worked for Bancroft Construction, did they—did you ever observe Bancroft use a wooden platform to raise workers up in the air to work?

---

2. The Court notes that none of the parties' present counsel were involved in the early stages of the case.

3. Bancroft and Shattuck filed a Motion for Summary Judgment on August 5, 2005, and after he was brought into the action, Johnson did the same on August 22, 2008. The former was denied on February 27, 2006, and the latter was denied on October 1, 2008. More will later be said about these motions and orders.

4. Rule 1.16(a)(1) requires a lawyer to withdraw from representation if "the representation will result in violation of the rules of professional conduct or other law[.]"

A. No. [*Changed to: "Yes, workers used wooden platforms."*]

Q. Never?

A. Never. [*Changed to: "Bancroft Construction used wooden platforms on several occasions."*]

Q. Not on any of the jobs that you worked on?

A. While I was there, no. [*Changed to: "I did witness the usage* [sic] *of wooden platforms."*]

Q. Okay. Did you ever see or observe any Bancroft employees be raised up by a forklift in a steel or metal basket to work?

A. Yes.

Q. Okay. But never in a wooden or on a wooden platform or wooden pallet or anything like that?

A. No. [*Changed to: "Yes. Wooden platform."*]

. . . .

Q. Sure. Would it be fair to say that you never observed any Bancroft employees working aboveground from a forklift, unless they were in a metal basket?

A. Correct. [*Changed to: "Not correct. Wooden platforms were used to work from."*]

[¶ 11] This dramatic change in Johnson's testimony concerning the primary issue of the case caused Johnson's deposition to be reopened on June 22, 2009. During the deposition, Johnson testified that, a few weeks before his original attorneys withdrew from the case, he had a conversation with them about changing his prior deposition testimony. In addition, during a break in the deposition, Johnson's attorney presented to Dollarhide's attorney a packet of previously undisclosed photographs, some of which were taken at the job site in 2001 by the project architect, and which show the wooden man-basket that had collapsed. Johnson's original attorneys had received the photographs from the architect at approximately the same time that they discussed with Johnson changing his deposition testimony.

[¶ 12] The jury trial began on August 10, 2009. That afternoon, in his opening statement to the jury, Dollarhide's counsel made the following comments following a lengthy statement about Bancroft Construction's use of wooden man-baskets and Johnson's change in testimony:

Let me tell you why this is so serious. In 2005 Shattuck and Bancroft filed their statements and copies of their Depositions with Judge Guthrie and on the basis of their sworn testimony told her throw the case out, *she didn't do it.* And in 2008 Michael Johnson with copies—filed a motion with copies of his affidavit, his answers to interrogatories, his 2008 deposition, depositions of Shattuck and Bancroft, all of which say [Dollarhide], it's your fault, you didn't do what we told you to do and asked Judge Guthrie to throw the case out, *she didn't do it.*

Michael Johnson retracted his testimony only after he learned that carpenters who worked on his crew were going to be willing to come forward and say that ain't so. And the question I'm going to ask him, which he can think about tonight, *if Judge Guthrie had thrown the case out saying the unanimous evidence is [Dollarhide] screwed up* would you have told anybody, Mr. Johnson, that a ruling was based on your lie? That's the question to which I want to get an answer in this case.

(Emphasis added.)

[¶ 13] No defense attorney objected to these comments at the time they were made, but before defense opening statements began, Bancroft's counsel moved for a mistrial based, among other things, on the contention that these comments "suggested to the jury that you [Judge Guthrie] think that it's a good lawsuit and they should too." The following morning, after allowing counsel to argue the matter, the district court granted the mistrial motion, concluding that the prejudice resulting from the statement could not be overcome with a curative instruction. On August 24, 2009, Bancroft filed a Motion for Sanctions based upon the mistrial. Bancroft sought $7,883.75 for expenses related to the aborted trial. On the following day, the district court entered an order taking the motion under advisement pending resetting and completion of the jury trial.

[¶ 14] Stepping back in time a few days before the filing of the just-mentioned motion and order, we will now briefly describe the events that led to the second issue presently before this Court. On August 17, 2009, less than a week after the mistrial was granted, Dollarhide filed a motion entitled "Plaintiff's Motion for Sanctions, for Order Requiring Supplementation of Defendants' Discovery Responses and for Remedial Measures Required by Wyoming Rules of Professional Conduct 3.3." In that motion, Dollarhide asked the district court to enter default against all three defendants as a sanction for their reliance upon Johnson's perjured testimony throughout the pretrial proceedings. In the same order in which the district court took Bancroft's sanctions motion under advisement, the same was done with Dollarhide's motion.

[¶ 15] The second trial began on August 31, 2009, and on September 8, 2009, the jury returned a verdict in favor of the defendants. That verdict is not the subject of this appeal. Rather, in addition to the grant of a mistrial and the denial of a default, Dollarhide appeals the district court's resolution of the parties' motions for sanctions. On November 13, 2009, the district court entered an order entitled "Re–Entry of Judgment, Award of Costs, and Order on Motions for Sanctions." After consideration of the parties' conduct throughout the pretrial and trial proceedings, and consideration of the verdict, the district court ordered as follows:

1. Dollarhide was to pay Teton County $2,235.45 for jury costs attributable to the mistrial.

2. The defendants were to pay Dollarhide $450.78 for the costs of the trial continuance occasioned by the change in defense counsel.

3. Dollarhide was ordered to pay Bancroft $2,844.47, Shattuck $778.18, and Johnson $3,537.42 as costs resulting from the defense verdict in the second trial.

4. Dollarhide was awarded nothing as a result of Johnson's perjured testimony, and

the defendants were awarded nothing as a result of the mistrial.

## DISCUSSION

### *Did the district court abuse its discretion in granting Bancroft's motion for mistrial and assessing costs against Dollarhide?*

[¶ 16] The gravamen of the mistrial motion, as well as the district court's rationale for granting the motion, was that Dollarhide's counsel had irrevocably tainted the jury by telling it, in effect, that Judge Guthrie had found Dollarhide to have a valid case against the defendants. The reason that we must affirm the district court is that it is impossible to show that the mistrial decision was unreasonable or arbitrary or capricious under these circumstances. While it is the law that "[g]ranting a mistrial is an extreme and drastic remedy that should be resorted to only in the face of an error so prejudicial that justice could not be served by proceeding with trial[,]" it is also the law that "[t]he trial court is also in the best position to assess the prejudicial impact of such error." *Warner v. State,* 897 P.2d 472, 474 (Wyo. 1995); *see also Martin v. State,* 2007 WY 2, ¶ 19, 149 P.3d 707, 712 (Wyo.2007). We are in no position to second-guess the trial court's on-site, real-time assessment.[5] Dollarhide argues that, "even if the statement was improper, it could have been cured by an instruction." Obviously, we also are in no position to test the accuracy of that assumption.

[¶ 17] Although not exactly the same, the facts of this case are similar to the facts in *State Farm Mutual Auto. Insurance Co. v. Resnick,* 636 So.2d 75 (Fla.Dist.Ct. App.3d Dist.1994), where the appellate court reversed the trial court's denial of a mistrial motion where the plaintiff's counsel during opening statement told the jury that "the judge has already determined that [the defendant] didn't have [proof of delivery of a

---

5. In one sense, once a mistrial has been granted, that issue is moot because that jury has been released and another trial has taken place, meaning that "any determination made at this juncture by this Court would have no practical effect on that outcome." *State v. Newman,* 2004 WY 41, ¶ 24, 88 P.3d 445, 454 (Wyo.2004). In such case, the only surviving issue may be the assessment of costs or sanctions.

notice]." *Id.* at 76. In reversing, the appellate court concluded that

> the remarks by [plaintiff's] counsel were such that an objection and instructions to disregard them could not cure the resulting prejudice. The trial judge is the dominant figure responsible for the management, direction, and control of the proceedings. In the adversary system, the jury looks to the trial judge for guidance. A comment of this nature, made at the beginning of the proceedings, can have a marked tendency to influence a jury in its analysis of the issue. We find the harm engendered by the comment made during opening statement is sufficiently pervasive and prejudicial to negate any curative value the judge's subsequent instructions might have had.

*Id.* at 77 (internal citations omitted). The same can be said of the case *sub judice.*

■ [¶ 18] As mentioned above, we also review the award or denial of costs and sanctions after a mistrial for an abuse of discretion. *See supra* ¶ 4. In the instant case, the district court ordered Dollarhide to pay $2,235.45 to Teton County for the jury costs attributable to the mistrial, but it denied the defendants' request for costs and attorney's fees in the amount of $29,044.31, likewise attributable to the mistrial. U.R.D.C. 503(b) provides as follows:

> (b) When a mistrial is caused by any party, the court may order that the party, or parties, reimburse the proper fund for fees and mileage paid to the witnesses, jurors and bailiffs for their attendance.

In other words, the district court clearly had the authority to order Dollarhide to pay the jury costs. As to sanctions, Dollarhide certainly has no complaint that the district court did not also order him to pay the $29,044.31 sought by the defendants for his having caused the mistrial. Under these circumstances, we would be hard-pressed to find the district court's assessment to be unreasonable, arbitrary, or capricious. As with the mistrial decision itself, the decision as to costs is a matter for the trial court's discretion. We see no abuse of that discretion here.

### Did the district court abuse its discretion in denying Dollarhide's motion for entry of default?

■ [¶ 19] After the mistrial brought an end to the first trial, and before the second trial started, Dollarhide filed a motion requesting, among other things, that the district court enter a default against the defendants on the issue of liability because of the last-minute change in Johnson's testimony. The district court took the motion under advisement until after the second trial. In its post-trial Re–Entry of Judgment, Award of Costs, and Order on Motions for Sanctions, the district court found that Johnson had admitted perjury and had changed his testimony, but that neither Bancroft nor Shattuck ever admitted perjury or changed his testimony. In regard to the latter two defendants, the district court stated:

> However, it is difficult for the Court to comprehend that the owner and general supervisor of a successful construction company—who had both been involved in the construction industry most of their adult lives—were so out of touch with the operations at their construction jobs that they were unaware that wooden platforms were being used to elevate workers.

The court then concluded that either Johnson alone, or in concert with the other defendants "perpetrated a fraud on the Court since 2005 with the false testimony that wooden platforms were not used as man-baskets on Bancroft construction sites." In the end, the district court resolved its apparent indecision as to the culpability of Bancroft and Shattuck by sanctioning all three defendants for the "fraud on the Court." The sanction was the denial to the defendants of their costs and attorneys' fees in the amount of $29,044.31.

[¶ 20] That brings us to the nub of Dollarhide's argument—he contends that monetary sanctions are simply insufficient in the face of perjury, especially where that perjury lies at the heart of a "fraud on the court." Dollarhide cites *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944) (*overruled on other grounds by Standard Oil Co. v. United States,* 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976)), as being the first case to recognize

what has come to be known as the "fraud on the court" doctrine. In *Hazel–Atlas,* the lower court's denial of a post-trial motion for relief from judgment was reversed by the Supreme Court because tampering with the administration of justice cannot be tolerated. *Id.* at 246, 64 S.Ct. at 1001.[6] It has been said that "fraud on the court" occurs "where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability to impartially adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1118 (1st Cir.1989).

[¶ 21] Many courts have recognized that courts possess the inherent authority to strike claims, or to strike answers, or to enter default, as sanctions for severe litigation abuse. *See, e.g., Campos v. Correction Officer Smith,* 418 F.Supp.2d 277, 279 (W.D.N.Y.2006) (complaint dismissed where plaintiff knowingly presented a falsified exhibit); *Vargas v. Peltz,* 901 F.Supp. 1572, 1579 (S.D.Fla.1995) (complaint dismissed where plaintiff fabricated evidence and committed perjury); *Sun World, Inc. v. Lizarazu Olivarria,* 144 F.R.D. 384, 389 (E.D.Cal. 1992) (default entered against defendants who submitted fraudulent documents and committed perjury); *Aoude,* 892 F.2d at 1118 (claim dismissed where plaintiff attached a "bogus" agreement to the complaint); *Eppes v. Snowden,* 656 F.Supp. 1267, 1279 (E.D.Ky. 1986) (answer and counterclaim stricken because defendant submitted backdated documents). Such severe sanctions should be available not just as punishment, but also as a deterrent to others from such conduct. *See Pearson v. First NH Mortg. Corp.,* 200 F.3d 30, 42 n. 7 (1st Cir.1999); *Nat'l Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976).

[¶ 22] The phrase "inherent authority" in this context describes those powers that "are necessary to the exercise of all others." *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764–65, 100 S.Ct. 2455, 2463–64, 65 L.Ed.2d 488 (1980). This Court has said that "courts have inherent powers beyond those specified in rules and statutes that are absolutely necessary to the courts' ability to perform the functions for which they were created." *Bi–Rite Package, Inc. v. Dist. Court of the Ninth Judicial Dist.,* 735 P.2d 709, 713 (Wyo.1987). Further,

> [c]ourts are vested with very great and far-reaching power to control their business and proceedings and to enforce their orders and process in conducting the business of a court. Courts must have these very great powers to ensure civility, orderly procedure, respect for the court as an institution and for its orders, and in the end an honest development of the facts of a controversy that will end in a just result.

*Id.* at 712.

[¶ 23] Needless to say, of course, is the fact that possession of the inherent authority to do something does not equate to the requirement that such be done. Whether a court chooses to impose a sanction as severe as dismissal or default is a matter left to that court's discretion, and our review of that decision, as stated above, is for abuse of that discretion. In the instant case, there are several factors that incline us not to reverse the district court's decision not to default the defendants. First, Johnson recanted his lies prior to trial and was re-deposed, and was cross-examined and impeached, allowing the trial to proceed with the jury having knowledge of, and basing its determination on, "the truth." Second, the complicity of Bancroft and Shattuck was surmised by the district court, but evidently not found by the jury, because the jury found in favor of the defendants. And third, the district court did not ignore the alleged misconduct, imposing a sanction of $29,044.31.

[¶ 24] Stated as a positive, the proper exercise of discretion means doing something that is reasonable under the circumstances. We do not reverse unless what was done by

---

**6.** *Hartford–Empire* had obtained a patent, and later won a patent infringement suit, by submitting a fraudulent trade journal to both the patent office and the court. *Id.* at 240–41, 64 S.Ct. at 998–99.

the district court was unreasonable. Perhaps the most significant procedural fact of this case is the fact that the false testimony was disclaimed by Johnson prior to trial, thereby allowing Dollarhide to present to the jury not only his view of the truth, but the attempt—admitted at least by one of the defendants—to hide the truth. The district court was satisfied that the change in testimony was sufficiently presented to the jury, and concluded that a default was not appropriate. We do not find that to have been an abuse of the district court's discretion.

## CONCLUSION

[¶ 25] The district court did not abuse its discretion in granting the motion for a mistrial, in denying the motion to enter a default, or in its costs and sanctions orders.

[¶ 26] Affirmed.