# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 84

APRIL TERM, A.D. 2014

*July 1, 2014*

BRENDA MILLER, as Personal
Representative of the Estate of Connie
Rae Scribner, Deceased,

Appellant
(Plaintiff),

v.

SEAN BEYER, M.D.; and
EMERGENCY MEDICAL
PHYSICIANS, P.C.,

Appellees
(Defendants).

SEAN BEYER, M.D.; and
EMERGENCY MEDICAL
PHYSICIANS, P.C.,

Appellants
(Defendants),

v.

BRENDA MILLER, as Personal
Representative of the Estate of Connie
Rae Scribner, deceased,

Appellee
(Plaintiff).

S-13-0204, S-13-0205

*Appeal from the District Court of Natrona County*
*The Honorable David B. Park, Judge*


***Representing Brenda Miller, as Personal Representative of the Estate of Connie Rae Scribner, Deceased:***
      G. Bryan Ulmer, III, and Larissa A. McCalla of The Spence Law Firm, LLC, Jackson, Wyoming; Robert M. Shively of Rob Shively, P.C., Casper, Wyoming. Argument by Mr. Shively.

***Representing Sean Beyer, M.D., and Emergency Medical Physicians, P.C.:***
      W. Henry Combs, III, and Andrew F. Sears of Murane & Bostwick, LLC, Casper, Wyoming. Argument by Mr. Sears.


***Before BURKE, C.J.\*, HILL, DAVIS, and FOX, JJ., and GOLDEN, J. (Ret.)***

*\* Justice Kite, who is recused from this case, was Chief Justice at time of oral argument*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GOLDEN, Justice (Ret.).**

[¶1]    Brenda Miller (Plaintiff), acting as personal representative for Decedent Connie Rae Scribner, filed a wrongful death action alleging medical malpractice against Sean Beyer, M.D. and Emergency Medical Physicians, P.C. (collectively Defendants).  The first trial ended in a mistrial and entry of an order requiring Defendants to pay attorney fees and costs.  The second trial ended in a jury verdict in favor of Defendants. Following the verdict in the second trial, Plaintiff moved for a new trial on grounds that the district court improperly admitted undesignated expert testimony given by Defendant Dr. Beyer and Defendants' retained expert.  The district court denied the motion, and Plaintiff appeals that denial.  Defendants cross-appealed, challenging the district court's order declaring a mistrial in the first trial.  We affirm both district court orders.

## ISSUES

[¶2]    Plaintiff frames the issues for our review as follows (footnotes omitted):

> Whether the district court erred when it refused to grant the Plaintiff/Appellant's motion for a new trial based on three independently sufficient reasons?
>
> A.    The district court improperly admitted opinion testimony from Defendant's expert Dr. Kurt Bernhisel which, in the interest of justice, requires a new trial;
>
> B.    The district court improperly admitted testimony regarding CURB-65 which, in the interest of justice, requires a new trial; and,
>
> C.    The district court improperly allowed Dr. Beyer to offer speculative, non-designated expert testimony concerning the BUN tests on the 21st and their relation to sepsis which, in the interest of justice, requires a new trial.

[¶3]    In their cross-appeal, Defendants state the issue on appeal as follows (footnote omitted):

> Whether the district court erred when it granted a mistrial, and subsequently awarded fees and costs, based upon a single unanswered question from defense counsel that, while arguably lacking in form or timing, touched upon relevant and admissible evidence that should have been presented to the jury.

1

[¶4] In responding to Defendants' cross-appeal, Plaintiff presents the following additional issue concerning the timeliness of Defendants' cross-appeal:

> A. The Cross-Appellants failed to timely file their notice of appeal as to the November 6, 2012 Order Allowing Costs and Fees for the mistrial, which was an appealable order because it was a [sic] "[a]n order affecting a substantial right in an action, when such order, in effect, determine[d] the action." Wyo. R. App. P. 105(a).

## FACTS

[¶5] On October 20, 2005, Connie Rae Scribner sought treatment at the Wyoming Medical Center emergency room. Ms. Scribner complained of a severe cough, upper respiratory infection, and difficulty breathing. She was evaluated by Defendant Dr. Sean Beyer, and he diagnosed her as suffering from bilateral pneumonia. While in the emergency room, Ms. Scribner was administered intravenous antibiotics and saline, inhalation treatments, cough medication, and Tylenol. After Ms. Scribner spent approximately three and one-half hours in the emergency room, Dr. Beyer noted her condition had improved and discharged her with care instructions and with prescriptions for an antibiotic, a cough syrup with codeine, and an inhaler.

[¶6] The following afternoon, on October 21, 2005, while at home with her twenty-year-old son and her boyfriend, Ms. Scribner stopped breathing. Ms. Scribner's son performed CPR and an ambulance was called, but Ms. Scribner died at the hospital that afternoon. The medical examiner found that Ms. Scribner died of "panlobar organizing and acute pneumonia."

[¶7] On January 15, 2008, Plaintiff filed a wrongful death complaint against Defendants.[1] In general terms, Plaintiff alleged that Defendants' care of Ms. Scribner fell below the standard of care because they failed to diagnose the seriousness of Ms. Scribner's condition and failed to admit her to the hospital for observation and treatment.

[¶8] A first trial began on August 27, 2012. On the fourth day of the first trial, during cross-examination of Decedent's son, defense counsel asked a question that described Decedent as a drug addict. On August 31, 2012, Plaintiff moved for and was granted a mistrial. On November 6, 2012, the district court entered an Order Allowing Fees and Costs, which awarded Plaintiff approximately $60,000 for costs and fees incurred in connection with the first trial. The orders declaring a mistrial and awarding fees and

---

[1] The complaint also named Wyoming Medical Center as a defendant, but by the time the matter reached trial, the only remaining defendants were Dr. Beyer and Emergency Medical Physicians.

costs are the subject of Defendants' cross-appeal. Additional facts related to the mistrial will be set forth in the discussion of that issue.

[¶9] A second trial began on March 18, 2013. On April 1, 2013, the case was submitted to the jury, and on that same date the jury returned a verdict finding no negligence in the care and treatment of Ms. Scribner. On April 18, 2013, the district court entered judgment on the verdict. On May 2, 2013, Plaintiff filed a motion for new trial pursuant to Rule 59 of the Wyoming Rules of Civil Procedure. Plaintiff moved for a new trial based on the district court's rulings that allowed testimony, over Plaintiff's objection, by Defendant Dr. Beyer and one of Defendants' expert witnesses concerning theories that Plaintiff contended were not disclosed during discovery. Plaintiff's motion asserted:

> On April 1, 2013, after only a few hours of deliberations, the second jury empaneled in the above captioned case returned a verdict finding that Dr. Beyer was not negligent in his care and treatment of the decedent Connie Scribner. The verdict followed nearly seven years of litigation and two weeks of trial during which defendant and his expert for the first time introduced new theories relating to liability and new, undesignated, untested and unreliable surprise opinion testimony. The theories offered by the defendant and his "expert" were based upon an incomplete and inadequate understanding of the very theories they advanced. The surprise opinion testimony was amorphous and changed repeatedly throughout the expert's sworn testimony. The evidence confused and mislead the jury, violated the principles behind expert disclosures, and failed to meet the requirements of relevance and reliability that govern expert testimony, ultimately denying the plaintiff the opportunity for a fair trial.

[¶10] On June 25, 2013, the district court denied Plaintiff's motion for a new trial. The court's denial of Plaintiff's new trial motion is the basis for Plaintiff's appeal. Additional facts relevant to this issue will be set forth in our discussion of the issue.

[¶11] On July 24, 2013, Plaintiff filed her notice of appeal, and on August 6, 2013, Defendants filed notice of their cross-appeal.

## STANDARD OF REVIEW

[¶12] The question whether Defendants' appeal from the district court's order declaring a mistrial was timely filed involves the jurisdiction of this Court and is subject to *de novo*

3

review. *Northwest Bldg. Co., LLC v. Northwest Distrib. Co., Inc.*, 2012 WY 113, ¶ 26, 285 P.3d 239, 245 (Wyo. 2012); *Inman v. Williams*, 2008 WY 81, ¶ 10, 187 P.3d 868, 874 (Wyo. 2008).

[¶13] A district court's ruling on a motion for mistrial is reviewed for an abuse of discretion. *Dollarhide v. Bancroft*, 2010 WY 126, ¶ 4, 239 P.3d 1168, 1170 (Wyo. 2010); *Hannifan v. Am. Nat'l Bank of Cheyenne*, 2008 WY 65, ¶ 36, 185 P.3d 679, 693 (Wyo. 2008); *Terry v. Sweeney*, 10 P.3d 554, 557 (Wyo. 2000). This Court likewise reviews a district court's decision whether to grant a new trial for an abuse of discretion. *Smyth v. Kaufman*, 2003 WY 52, ¶ 13, 67 P.3d 1161, 1165 (Wyo. 2003); *Richardson v. Schaub*, 796 P.2d 1304, 1308 (Wyo. 1990). We also review a district court's rulings on the admissibility of evidence, including whether to exclude expert testimony, for an abuse of discretion. *Black Diamond Energy, Inc. v. Encana Oil & Gas (USA), Inc.*, 2014 WY 64, ¶ 34, 326 P.3d 904, 913 (Wyo. 2014) ("Rulings on the admissibility of evidence are within the sound discretion of the trial court and will not be disturbed by this Court absent a clear abuse of discretion."); *Wilson v. Tyrrell*, 2011 WY 7, ¶ 50, 246 P.3d 265, 279 (Wyo. 2011) ("The question of the admissibility of evidence is primarily a question for the trial court.").

[¶14] The following will be considered in determining whether a district court has abused its discretion:

> "'Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.'" *Vaughn v. State*, 962 P.2d 149, 151 (Wyo. 1998) (quoting *Martin v. State*, 720 P.2d 894, 897 (Wyo. 1986)); see also *Stroup v. Oedekoven*, 995 P.2d 125, 128 (Wyo. 1999).

>> In determining whether there has been an abuse of discretion, we focus on the "reasonableness of the choice made by the trial court." *Vaughn*, 962 P.2d 149, 151 (Wyo.1998). If the trial court could reasonably conclude as it did and the ruling is one based on sound judgment with regard to what is right under the circumstances, it will not be disturbed absent a showing that some facet of the ruling is arbitrary or capricious.

> *Jordan v. Brackin*, 992 P.2d 1096, 1098 (Wyo. 1999).

*Dollarhide*, ¶ 4, 239 P.3d at 1170 (quoting *Hannifan*, ¶ 36, 185 P.3d at 693).

4

## DISCUSSION

[¶15]  Addressing the issues in chronological order, rather than in the order in which they were presented on appeal, we first address Defendants' appeal from the order granting a mistrial in the first trial.  We will then turn to the issues related to the admission of expert testimony in the second trial and the denial of Plaintiff's motion for a new trial following the jury's unfavorable verdict in that second trial.

### A.     Order Granting Mistrial

[¶16]  The district court declared a mistrial of the first trial because, on cross-examination of Decedent's son, defense counsel asked a question that described Decedent as a drug addict.  The court found the question improper on grounds that the question assumed facts not in evidence, called for speculation, was based on hearsay, was not relevant, and was unfairly prejudicial to Plaintiff.  In considering Defendants' appeal of the mistrial order, we will first address Plaintiff's argument that Defendants' appeal was not timely, and then we will consider Defendants' abuse of discretion argument.

### 1.     Timeliness of Appeal

[¶17]  On August 31, 2012, Plaintiff moved for a mistrial, and the district court granted that motion.  In so ruling, the court directed Plaintiff's counsel to submit an application for costs and fees and indicated it would rule on that application after Defendants' counsel had an opportunity to respond.  The court also set a scheduling conference for the purpose of choosing a date for the second trial.

[¶18]  On September 5, 2012, the district court issued a Scheduling Order that set a new trial date of March 18, 2013.  On September 17, 2012, Plaintiff filed her motion for attorney fees and costs related to the mistrial, and on October 2, 2012, Defendants responded to that motion.  On November 6, 2012, the court entered an Order Allowing Costs and Fees.

[¶19]  Plaintiff does not contend that the district court's August 31, 2012 order granting Plaintiff's motion for a mistrial was an appealable order.  Instead, Plaintiff contends that the court's Order Allowing Costs and Fees was the appealable order and that because Defendants did not file their cross-appeal until August 6, 2013, their appeal of the mistrial order and Order Allowing Costs and Fees was untimely.  We disagree.

[¶20]  In arguing that Defendants' appeal was untimely, Plaintiff relies solely on Rule 1.05(a) of the Wyoming Rules of Appellate Procedure.  Rule 1.05(a) defines an appealable order as "[a]n order affecting a substantial right in an action, when such order, in effect, determines the action and prevents a judgment."  W.R.A.P. 1.05(a).  This Court

has held that "an appealable order under Rule 1.05(a) has 'three necessary characteristics. . . . It must affect a substantial right, determine the merits of the controversy, and resolve all outstanding issues.'" *In re E.R.C.K.*, 2013 WY 160, ¶ 28, 314 P.3d 1170, 1176 (Wyo. 2013) (quoting *In re KRA*, 2004 WY 18, ¶ 10, 85 P.3d 432, 436 (Wyo. 2004)). Said another way, to be appealable, an order must leave nothing for future consideration. *In re KRA*, ¶ 10, 85 P.3d at 436 (citing *Public Serv. Comm'n v. Lower Valley Power & Light, Inc.*, 608 P.2d 660, 661 (Wyo. 1980)). The purpose of these Rule 1.05 requirements is "to avoid fragmentary appeals and decisions made in a piecemeal fashion." *Estate of McLean ex rel. Hall v. Benson*, 2003 WY 78, ¶ 8, 71 P.3d 750, 753 (Wyo. 2003).

[¶21] Applying these principles, the district court's orders granting a mistrial and awarding costs and fees were not appealable orders. While the question of the mistrial may have been settled once the court issued its order awarding costs and fees, that issue was only one discrete part of the controversy. The parties' controversy would not be fully determined on the merits until after the second trial. The orders declaring a mistrial and awarding costs and fees thus did not determine the action or prevent a judgment as required by Rule 1.05(a), and a ruling that the mistrial orders were immediately appealable would necessarily result in the type of fragmentary appeals and piecemeal decisions that Rule 1.05 was intended to avoid. *See Davis v. Davis*, 985 P.2d 643, 646-47 (Ariz. Ct. App. 1999) (holding that an order granting a mistrial prior to judgment being entered is not an appealable order because such an order neither determines the action nor prevents judgment from which an appeal might be taken); *Howard v. Kuehnert*, 641 N.E.2d 804, 805-06 (Ohio Ct. App. 1994) (interpreting provisions similar to W.R.A.P. 1.05 and holding that orders relating to declaration of mistrial not appealable because a new trial necessarily follows).

[¶22] This case has taken an appellate path similar to that followed in *Terry v. Sweeney*, a personal injury lawsuit involving a motor vehicle accident. *Terry*, 10 P.3d at 555. A mistrial was declared in *Terry* when a witness for the plaintiff, in violation of a pretrial order, referenced the defendant's insurance coverage. *Id.* at 556. The trial court entered an order awarding costs related to the mistrial, and the matter remained pending for two years because the court would not set a new trial until the plaintiff paid the costs. *Id.* The plaintiff continued in her failure to pay the award of costs, and, nearly three years after entry of the original order awarding costs, the trial court entered an order of dismissal with prejudice. *Id.* at 557. The plaintiff then appealed the dismissal order and the orders declaring a mistrial and awarding costs. *Id.* This Court did not directly address the timeliness of the plaintiff's appeal from the orders declaring a mistrial and awarding costs, but given our willingness to dismiss an appeal on our own motion when we find that an order is not appealable, our acceptance of the appeal and ruling on the issues presented signaled that the appeal had been properly taken. *See Bd. of Trustees of Mem'l Hosp. of Sheridan Cnty. v. Martin*, 2003 WY 1, ¶¶ 9-16, 60 P.3d 1273, 1275-77 (Wyo. 2003) (dismissing appeal on ground that order was not appealable though issue was not raised by parties).

[¶23]  Our ruling in *Terry* implicitly recognized that an order declaring a mistrial is not an appealable order itself and that the proper procedure for appealing such an order is to take an appeal after the parties' controversy is fully determined on the merits.  *See also Dollarhide*, ¶ 16 n.5, 239 P.3d at 1173 n.5 (reviewing the trial court's exercise of discretion in granting a mistrial while at the same time observing the arguable mootness of the issue given that by the time a mistrial ruling makes its way to the Court on appeal the jury has been released and another trial has taken place).

[¶24]  The orders declaring a mistrial and awarding costs and fees did not determine the action or prevent a judgment, and neither order was therefore an appealable order as defined by W.R.A.P. 1.05(a).  We thus conclude that Defendants' appeal of the mistrial order was timely and turn then to Defendants' argument that the district court abused its discretion in declaring a mistrial.

**2.      District Court's Exercise of Discretion in Declaring Mistrial**

[¶25]  As noted above, the offending question that led the district court to declare a mistrial was one that described Decedent as a drug addict.  Evidence relating to Decedent's alleged use of Vicodin and marijuana, her alleged alcohol use, and her alleged drug-seeking behaviors was the subject of motions in limine and multiple arguments to the district court, both pretrial and during trial.  At a pretrial motions hearing, Defendants argued that the evidence was relevant to Decedent's cause of death and was therefore admissible.  Essentially, Defendants contended that Decedent misused her prescription medications and consumed alcohol and marijuana, and that these actions combined with Decedent's pneumonia to cause her respiratory failure.  Plaintiff argued for exclusion of evidence related to Decedent's history of drug and alcohol abuse on grounds that the prejudicial nature of the evidence outweighed its probative value because there was no evidence that showed a recent use of Vicodin or a link between Decedent's marijuana use and her respiratory failure.  At a pretrial motions hearing, the district court ruled that evidence related to Decedent's past abuse of Vicodin was not admissible because the allegations were too remote in time.  With respect to Decedent's use of marijuana, the court ruled:

> THE COURT:  My inclination is to grant the motion with regard to the THC.  I'm getting different versions of what the experts are going to say, so I am – I'm reserving to the defendant if they can somehow specifically tie the THC to the cause of death; but, you know, if the argument is, Well, she was smoking marijuana and under the influence and made a bad decision, I don't see any experts willing to say that – I may have missed that – but, you know, you have to somehow say she had X number of nanograms in her system and then

7

this is how it affects her judgment. I may have missed it, but I don't see that in any of the designations.

* * * *

THE COURT: It does seem to me to be more prejudicial than probative of anything; but I – as the testimony develops, I will reconsider that ruling at the request of the defendants.

[¶26] On the first morning of the first trial, defense counsel requested clarification on the district court's rulings concerning Decedent's drug use, and the following exchange took place:

[Defense Counsel]: * * * Due to the delicate nature of a few of the rulings that you've made in the past, the Zithromax and Vicodin and marijuana and so on, we just want to make sure that we all understand what to say and what not to say during voir dire and openings.

So the first question I have, I know there was a motion that you heard about a particular ER record with Connie Scribner, where she admitted she had been seeking Vicodin; and you said there's no reason to reference that record. And that's fine. What we would like to do, however, Your Honor, is establish that she was a drug seeker, because it goes to – the plaintiffs have made a big deal about who it was that could have possibly consumed the medications at her home. The fact that she's a drug seeker in the past goes to the fact that she sought the high from time to time for whatever medications she could get, and it establishes and provides some background information about who in fact was the most likely person to have taken the extra gabapentin and the codeine cough syrup. So your ruling was specifically tailored to that specific medical record; but we didn't want to violate anything by mentioning other Vicodin or other records that reference that or her history of drug-seeking behavior.

[Plaintiff's Counsel]: * * * Well, I know that your ruling was specific to that record; but it was based upon the idea that the nature of the drugs she had admitted to seeking a year prior, over a year prior, was Vicodin; that there was no Vicodin in her system. It was tested for. There was no evidence that she had engaged in any drug-seeking behavior for at least a year

8

prior to this event. And that it is therefore a prior bad act which should be excluded. And so the – the discussion was a lot broader than, Oh, can we – do we erase the reference in this record. I think that was the context in which it came up, but it was because of the remoteness in time and the risk of unfair prejudice relating to it and also that – that there was no evidence to – to support admission of such evidence under habit or anything else because of the lack of time and the dissimilarity between that particular drug that is historically an issue and the drugs involved at the time of this event.

[Defense Counsel]: Even though the drug at issue in this case wasn't whether Vicodin killed her, the cause of her death is definitely an issue. And one of the – our entire theory of the case is that she overmedicated herself. And so it goes to that point, because they have contested that she consumed the cough syrup and they have contested that she consumed the gabapentin without any proof whatsoever that anybody else could have taken it. And so it's important for that, Your Honor, on this particular issue.

THE COURT: You may respond to those things but only those things. As to other drug-seeking proclivities, I will rule on those questions as they come up. But do not address it in your opening.

[¶27] On the second day of trial, the issue of Decedent's drug use again raised its head when Plaintiff's expert referred to Decedent's past "prescription drug issues" during cross-examination by defense counsel. The following exchange then occurred:

[Plaintiff's Counsel]: Through no doing of [Defense Counsel], there was testimony from the doctor that the medical records in the past indicated some prescription drug issues. Right now, I would like to leave that alone. I would like the opportunity – because we have a motion in limine to preclude that evidence. I think that the doctor is tired because, of course, I informed him of that. I don't want it to go further. I would like the opportunity to discuss with the witness that it is not something he should say. I don't think it was error in any way for [Defense Counsel]. I'm not objecting to that. I don't have a problem with that. I would like the opportunity now to make it not worse, and I do not think that he opened the door to it because he just said issues

9

and not – didn't define it any more. So I would like to stop it in its tracks.

[Defense Counsel]: * * * I understand that you have ruled that the 2004 incident with regard to the Vicodin is not admissible; and I wasn't really focused on him saying what he said. I don't intend to go further with it right now; but I want you to know that it is my position that her drug-seeking mentality is at issue and it's germane to Dr. Kulig's opinions in this case about what happened to the drugs and what happened to Connie.

THE COURT: All right. I'm not going to make a ruling on that at this point.

[¶28] On the third day of the first trial, another exchange took place between the court and counsel concerning evidence related to Decedent's alleged drug use:

THE COURT: Okay. I want to at least have you prepared to discuss something if you're not now, and I suspect you're not. An issue has come up occasionally – and my guess is it's going to – there's going to be [an] increasing chance for it come up the further we go into this case. And I can't remember the phrase that [Defense Counsel] uses, but it has to do with allegations of drug abuse by Ms. Scribner. And you referred to that as high seeking or –

[Defense Counsel]: Drug seeking.

THE COURT: Drug seeking. So I'm not sure what it is that you're trying to establish. Are you trying to establish habit or are you trying to establish character or character through habit? I want some – I'm trying to prepare for this, so I'm trying to delineate the issue.

* * * *

[Defense Counsel]: It's character. And it comes under 404(b), where it says it's admissible for other purposes, such as proof of motive, opportunity, intent, those sorts of items. And just so they can respond to both of the things, I just want to make sure we don't run into a problem with Adam Scribner.

10

THE COURT: I just wanted to know what the issue was so I can be prepared. I don't know if you said you want to respond now or not.

[Defense Counsel]: Can I say one more thing? Just because I don't want anybody to be unfairly surprised, and I want to be fair, too.

But with Adam Scribner, there's evidence in the records – he's claiming damages in this case as a family member based upon his relationship with his mother and what he's lost as a result of her death. There is evidence in the records that she told medical providers that her kids believed she was a drug addict and – along with other opinions that her kids had of her. But I'm going to ask that question of him, you know, Did you believe your mom was a drug addict. I don't know what he'll say. But it's in the records that she reported that to medical providers. And so it's not to show whether she was a drug addict on the day that she actually died, but it's relevant to the relationship that they had with one another and his claim for damages and the daughter's claim for damages, as well.

* * * *

THE COURT: If this is not going to come up in this next witness, we can postpone this discussion and bring the jury back in and go forward. I didn't mean to get so distracted. I was just trying to delineate the issue. I didn't really mean to get into a full-blown argument on it.

[Defense Counsel]: I believe that Dr. Beyer is the next witness, they will tell you. But if he's the next witness, this probably is not coming up in his testimony.

THE COURT: All right. Let's proceed, then, with the jury; and we'll discuss this. But the parties are going to have to alert me when they anticipate it.

[¶29] On the fourth day of the first trial, defense counsel's cross-examination of Decedent's son, Adam Scribner, led to the following exchange and motion for a mistrial:

11

Q.  Did you ever think of your mom as a drug addict?

A.  No, absolutely not.

Q.  Do you have any idea why she would report that to any of her health care providers, that her children thought she was a drug addict?

[Defense Counsel]:  Your honor, may we approach?

THE COURT:  Yes.

[Bench Conference]

THE COURT:  So we're here.

[Defense Counsel]:  And I'm not going any further.

[Plaintiff's Counsel]:  It's too late.  Thank you very much.

I request a mistrial.  This is subject to a motion in limine to preclude prior drug use.  We talked about it three times, not less than that.  And now you're coming up and you're asking him in front of the jury, Do you know why your mom would tell health care providers she's a drug addict.  Not only is this something that's been the subject of motions in limine but it's also hearsay.

[¶30]  The district court then excused the witness, recessed for the day, and instructed counsel to reconvene the following morning for further discussion of Plaintiff's motion for a mistrial.  The next morning, August 31, 2012, the hearing on Plaintiff's mistrial motion was held.  At the outset of the hearing, the court described its concerns with the question asked by defense counsel:

There are many, many problems with this question.  First, it assumes a fact not in evidence.  Not only does it assume a fact not in evidence, it assumes a fact unlikely to be in evidence.

Secondly, when a question starts "Do you have any idea," that certainly is a red flag that it's going to call for speculation.  And in this case, it does.  So it requires the witness to speculate.

12

Third, it is hearsay based on hearsay; arguably, double hearsay; and depending on the context of the question, triple hearsay.

Fourth, it has questionable, at best, relevance. If the question is offered to show Adam's impression of his mother, putting aside all of the other problems that I mentioned, then it proves nothing, because you can't determine from the context of the question whether assuming he said that – and I'm only assuming that for purposes of this limited discussion – he was asking for help, he was being critical of her, or he was not doing either. And, again, that's assuming he asked for it, and I'm not making that assumption. If it is offered to show Ms. Scribner's character, then it doesn't establish anything.

Finally, it is extremely prejudicial for two reasons. First, it is the use of the term "drug addict." It did not say use drugs, controlled substance, or prescription medicine. It did not even say abused drugs or controlled substances or prescription medicine. And I think the term "drug addict" for many of us brings up or conjures visions of people in alleys shooting up with needles in dirty places.

It is also prejudicial because it can't be answered. It's worse than when did you stop beating your dog. If Adam were to say he has no idea why his mother would say that, it still leaves open the suggestion that he thought his mother was a drug addict or worse, that she was a drug addict. If he says he has no idea and he didn't say that, it still leaves open the suggestion that his mother might have said it; and he obviously has no ability to respond to that question.

So the question clearly can't stand. And there wasn't formally an objection; but I assume for all practical purposes there was, and that objection is sustained.

The question should not have been asked. I have to believe that very little critical thought was given to that question. It is difficult for me to say this, because I have known [Defense Counsel] for many years – I think she appeared in front of me when I was a county judge – but the

13

fact of the matter is I think that's the worst question I've ever heard posed to a witness in my legal career.

You notice that in my discussion I have not considered the impact of the liminal motions on Vicodin or marijuana. There are a couple of problems with that. No orders have been entered that I can find. I did review my oral rulings. They are not specifically on point, but it's difficult for me to believe that anybody who was present for those hearings didn't understand I had any serious reservations about any mention of any other drugs. But that's not part of my analysis nor am I considering this part of my analysis, my belief that I thought the parties would approach first before these kinds of things were brought up. That may not have been clear, and so I'm not really considering that.

But as I said, the question was – the objection is sustained. It should not have been presented. And so we're now going to focus on what the remedy is.

[¶31] After additional discussion and argument concerning possible curative instructions, Plaintiff renewed her motion for a mistrial. The district court granted the motion, stating:

I think that the remarks made by counsel were not made in bad faith. It was a momentary lapse in judgment and that's all, and everybody is susceptible to that. But they are such that objection and instructions to disregard them cannot cure the resulting prejudice. So I will grant the motion for a mistrial.

[¶32] Defendants argue that the district court abused its discretion in granting a mistrial. In so arguing, Defendants challenge the court's conclusion that the healthcare record on which defense counsel based her question, and Decedent's alleged statement contained in that record, were inadmissible. As the linchpin of their analysis, Defendants contend that neither the healthcare record nor Decedent's statement contained within that record constituted inadmissible hearsay. They assert:

Absolutely no analysis was made as to whether the statements were subject to hearsay exceptions. This is particularly problematic, because even a rudimentary inquiry into the hearsay exclusionary rule and its exceptions would have likely yielded a different result. Given the absence of any

14

meaningful discussion or reference to the actual hearsay rules, the court's conclusions were not reasonable or based upon sound judgment.

[¶33] The Defendants follow this statement with a detailed argument as to why the record and Decedent's statements therein were not hearsay. The record shows, however, that Defendants' hearsay arguments were not presented to the district court. Not only did Defendants not argue to the district court that the healthcare record and Decedent's statement therein were not hearsay, defense counsel informed the court that she had no intention of seeking admission of the healthcare record. Defense counsel stated, our emphasis added:

> They are asking for a lot of money for damages. And he continually described this very good relationship he had with his mom. ***And in the record I was referencing, I didn't put it in evidence and I didn't plan to, because there was more in that record; but it was from Central Wyoming Counseling Center, I believe.*** And it referenced that – her horrible relationship with her kids. They think I'm a drug addict. I wasn't going to be cruel to Adam and point out what his mom thought of her kids. There's so many references in many of the medical records that she was less than fond of her children. And I wasn't going to ever go that direction. That would be cruel. But the fact is they were talking about their opinions of one another, their relationship. He had already talked about his conviction for a couple of drug-related crimes. And so it went right to that issue in my mind. Apparently, it was very poor judgment. And I – believe me; I'm very apologetic for that. I – I thought I alerted everybody to that. And I – maybe I'm ignorant about how harmful that question could have been. It was not intentional.

[¶34] This Court has repeatedly stated that it will not consider arguments made for the first time on appeal. *State ex rel. Dep't of Family Serv. v. Kisling*, 2013 WY 91, ¶ 14, 305 P.3d 1157, 1162 (Wyo. 2013); *BP America Prod. Co. v. Dep't of Revenue*, 2006 WY 27, ¶ 33, 130 P.3d 438, 468 (Wyo. 2006). And we have explained why new arguments are particularly problematic when we are reviewing a court's decision for an abuse of discretion:

> It simply is not appropriate for this Court to reverse a district court ruling on grounds that were never presented to it. *Whitten v. State*, 2005 WY 55, ¶ 24, 110 P.3d 892, 898 (Wyo. 2005). This is particularly true when our review is for an

abuse of discretion because to determine whether there was an abuse we necessarily must consider the arguments and evidence presented to the district court. *Amoco Prod. Co. v. Dep't of Revenue*, 2004 WY 89, ¶ 53, 94 P.3d 430, 449 (Wyo. 2004). Plainly stated, a party cannot fail to present an argument and then argue on appeal that the district court abused its discretion in not considering the argument the party did not present.

*Sundance Mtn. Resort, Inc. v. Union Tel. Co.*, 2007 WY 11, ¶ 17, 150 P.3d 191, 196 (Wyo. 2007).

[¶35]  In arguing against the motion for mistrial, defense counsel did not contest the district court's characterization of the question as being based on inadmissible hearsay, assuming facts not in evidence, or calling for speculation.  Instead, defense counsel argued that: 1) she did not believe her question violated any of the court's orders; 2) that the question went to the quality of Decedent's relationship with her children and was therefore relevant to damages; and 3) that the question was not unfairly prejudicial to Plaintiff.  Defense counsel concluded her argument:

> The Court, of course, granting a mistrial is an extreme and drastic remedy that should be resorted to only in the face of an error so prejudicial that justice could not be served by proceeding with trial.  So the question remains what potential prejudice does exist with the jury.  At the time that question was asked, the jury already knew that Ms. Scribner had high levels of codeine in her system; that she had alcohol in her system; that she was on multiple medications for her bipolar disorder; that she had gone to Wyoming Medical Center emergency room in excess of 40 times; and that she had smoked pot with her son as early as two weeks before her death.  They didn't object to any of that.  And so the jury already had that information about her.  This and what a – whether he knew what his mom told the medical care provider, to me, doesn't add anything more detrimental or more damaging than what the jury already knew about Ms. Scribner.  And so I think we're lacking the prejudice necessary to grant a mistrial.
>
> I agree wholeheartedly that you should give a cautionary – or a curative instruction to the jury and blame it on me and say that I asked an inappropriate question.  I'm fine with that.  * * *

16

So I would just ask that an instruction be given to the jury that questioning by [Defense Counsel] to Adam Scribner regarding drug-addict questions were improper and inappropriate and that they should disregard them, you know, judge the case based on the evidence, the questions of attorneys are not evidence, that kind of thing.

I'm sorry, other than that.

[¶36] Given that defense counsel did not argue before the district court that the court was wrong in its conclusion that the offending question was based on inadmissible hearsay, assumed facts not in evidence, or called for speculation, we will not consider Defendants' arguments to that effect on appeal. Instead, we will confine our review to the question of whether the district court abused its discretion in finding that the question was so prejudicial as to warrant a mistrial.

[¶37] The district court found defense counsel's question "extremely prejudicial" because of its use of the term "drug addict" and the negative connotations associated with that term and because the question could not be answered in a meaningful way by the witness. We have previously explained why it is difficult for this Court to second-guess such a determination by a trial court:

The gravamen of the mistrial motion, as well as the district court's rationale for granting the motion, was that Dollarhide's counsel had irrevocably tainted the jury by telling it, in effect, that Judge Guthrie had found Dollarhide to have a valid case against the defendants. The reason that we must affirm the district court is that it is impossible to show that the mistrial decision was unreasonable or arbitrary or capricious under these circumstances. While it is the law that "[g]ranting a mistrial is an extreme and drastic remedy that should be resorted to only in the face of an error so prejudicial that justice could not be served by proceeding with trial[,]" it is also the law that "[t]he trial court is also in the best position to assess the prejudicial impact of such error." *Warner v. State*, 897 P.2d 472, 474 (Wyo. 1995); *see also Martin v. State*, 2007 WY 2, ¶ 19, 149 P.3d 707, 712 (Wyo. 2007). We are in no position to second-guess the trial court's on-site, real-time assessment. Dollarhide argues that, "even if the statement was improper, it could have been cured by an instruction." Obviously, we also are in no position to test the accuracy of that assumption.

17

*Dollarhide*, ¶ 16, 239 P.3d at 1173 (footnote omitted).

[¶38] The question of Decedent's alleged drug abuse and whether evidence would be permitted regarding those and related allegations was the subject of multiple arguments and discussions between counsel and the district court. The record clearly illustrates that the court was sensitive to the potential prejudice of such evidence and intended to allow its use for only limited purposes when appropriate. The district court was in the best position to assess how evidence was being received and whether an improper question had so crossed a line that the unfair prejudicial taint was irrevocable. Based on the record before us, we cannot find that the court's assessment was unreasonable, arbitrary or capricious.

## B.     Order Denying Plaintiff's Motion for New Trial

[¶39] We turn then to Plaintiff's appeal. We will begin our discussion of Plaintiff's appeal with an overview of the parties' competing theories concerning whether the standard of care required that Decedent be hospitalized. Against that backdrop, we will discuss the district court's admission of testimony by Defendant Dr. Beyer and Defendants' emergency medicine expert, Dr. Kurt Bernhisel, and Plaintiff's objections to that testimony and motion for new trial based on that testimony.

### 1.     Overview

[¶40] As noted earlier, in general terms, Plaintiff alleged that Defendant Dr. Beyer's care of Decedent fell below the standard of care because he failed to diagnose the seriousness of Decedent's condition and failed to admit her to the hospital for monitoring and treatment. More particularly, Plaintiff's theory, presented through her emergency medicine expert, Dr. Anthony Haftel, was that Defendant Dr. Beyer should have diagnosed Decedent as suffering from sepsis, which is a toxic response to an infection, and should have recommended hospitalization to treat the sepsis.

[¶41] In offering this theory, Dr. Haftel testified to a definition of sepsis, which he described as a nationally accepted guideline. Dr. Haftel defined sepsis as an infection plus SIRS, which is the acronym for systemic inflammatory response syndrome. He explained that SIRS occurs when a patient has two or more of the following symptoms: 1) a temperature greater or equal to 38 degrees Celsius (100.4 degrees Fahrenheit); 2) a pulse rate over 90 beats per minute; 3) a respiratory rate over 20 breaths per minute; and 4) a white blood cell count greater than 12,000. Essentially, Dr. Haftel testified that a patient has sepsis if the patient has an infection, such as pneumonia, and two of the four SIRS symptoms.

[¶42] Dr. Haftel testified as to the danger of sepsis, explaining that sepsis can progress on a continuum: sepsis to severe sepsis to septic shock to multiple organ dysfunction and eventually to death. He further testified that this progression can occur in some cases within twenty-four hours and that a diagnosis of sepsis requires hospitalization.

[¶43] Dr. Haftel concluded that when Decedent first presented to the emergency room on October 20th, she had pneumonia and met two of the four SIRS criteria: her white blood cell count was elevated above 12,000 and her pulse rate was greater than 90. He further concluded that when Decedent was discharged from the emergency room, a few hours later, her condition had worsened and she met all four of the SIRS criteria. On this basis, Dr. Haftel opined that Decedent had sepsis and that the standard of care required that she be admitted to the hospital for monitoring and treatment.

[¶44] Defendants did not dispute Plaintiff's definition of sepsis. Defendant Dr. Beyer testified, on examination by Plaintiff's counsel:

> Q. [Dr. Haftel] talked about the four criteria for systemic inflammatory response syndrome. And are those accurately reflected there?
>
> A. They are.
>
> Q. Okay. And you know and knew in 2005 that it only takes two or more of those criteria to conclude that a patient has systemic inflammatory response syndrome?
>
> A. Yes.
>
> Q. And do you agree that pneumonia is an infection in the lungs?
>
> A. Yes.
>
> Q. And so if somebody has pneumonia and two or more of these criteria, would you agree that they have – they meet the definition for sepsis?
>
> A. Yes.

[¶45] Defendants did not dispute the SIRS plus infection definition of sepsis. What they instead challenged was Plaintiff's assertion that the standard of care requires hospitalization of any patient who presents with symptoms meeting that definition of sepsis. Defendants presented testimony, through Defendant Dr. Beyer and through

19

Defendants' expert, Dr. Bernhisel, that the SIRS plus infection definition of sepsis is not a good prognostic tool for predicting whether a patient will progress through the sepsis spectrum from sepsis to severe sepsis to septic shock to organ failure and death. Essentially, Defendants' position was that the SIRS plus infection definition of sepsis is an overly cautious and overly sensitive guideline for determining when a patient must be hospitalized. In keeping with that view, Dr. Bernhisel testified on direct examination by defense counsel:

> Q. How many pneumonia patients have three or four of the SIRS criteria and an infection?
>
> A. A lot. I don't have – I don't know if there's a statistic that would tell you – tell you that. But we see a lot of pneumonias, and the majority of them have SIRS criteria.
>
> Q. Do you admit the majority of them or send the majority of them home?
>
> A. We send the majority of them home.

[¶46] Defendants offered alternative guidelines, known by the acronyms CURB-65 and PORT, which Defendants contended were more accurate predictors of mortality risk associated with pneumonia and provided better guidance on whether a patient should be hospitalized. CURB-65 is a pneumonia severity index, with each letter of the acronym signifying a condition in the patient. Broken down, the letters stand for: C-confusion; U-urea, requiring an elevated blood urea nitrogen (BUN) level; R-respiration, requiring a respiratory rate elevated to more than 30 breaths per minute; B-blood pressure, requiring a systolic blood pressure below 90 or a diastolic blood pressure below 60; and 65 stands for an age of 65 or greater. The index specifies that a patient meeting one or two of these criteria may be discharged home and a patient meeting three criteria should be considered for hospital admission or very close monitoring.

[¶47] PORT is an acronym that refers to the title of a study: "Pneumonia Patient Outcomes Research Team (PORT) validation study (1991)." The PORT guideline requires consideration of factors such as demographic features, physical exam features and initial vital signs, including age, altered mental status, pulse, blood pressure, and respiratory rate, and, then based on those factors, classifies the level of the patient's mortality risk.

[¶48] Defendant Dr. Beyer testified that application of the CURB-65 criteria to Decedent's symptoms on October 20 indicated that it was acceptable to discharge her home. Dr. Bernhisel testified that based on application of either the CURB-65 criteria or

20

the PORT criteria, Decedent had a low mortality risk and it was acceptable to discharge her home.

[¶49] With this background on the parties' competing theories, we will turn to Plaintiff's objections to certain of the testimony by Drs. Beyer and Bernhisel.

**2.     Plaintiff's Objections**

**a.     Dr. Bernhisel's Testimony**

***Dr. Bernhisel's Testimony Re: SIRS Plus Infection Definition of Sepsis***

[¶50] During trial, Plaintiff's counsel objected to two aspects of Dr. Bernhisel's testimony. His first objection was to Dr. Bernhisel's testimony that although the SIRS plus infection definition of sepsis is useful in a research setting, it is not useful in a clinical setting for predicting whether a patient will progress further on the sepsis continuum or for assessing whether a patient should be hospitalized. Specifically, Dr. Bernhisel testified concerning a follow-up study on the SIRS plus infection definition of sepsis, explaining:

> Then the next conclusion was that these definitions do not allow for precise staging or prognostication of the host response to infection. That's kind of gobbledygook, but let me try to give you what I think it says. That these definitions, the SIRS sepsis definition, are not such that you can say, Well, if you've got two of these or three of these, you're more severe than somebody that has just two of them, or four means that they are sicker than three. I think you heard testimony that Dr. Haftel said if they had four of them, that was worse than three. And there is no staging. It's not – it's not – it's not that type of a – of a system. So – and you can also not prognosticate. There are – which means predict. You can't predict from this how the host – it's a great word; it means patient. But when you're a scientist and academician, you're going to use a word like "host." Clinicians often use "patient." You can't predict how each patient is going to respond to these SIRS definition. It's SIRS sepsis. It's – it's – they can't look at that and say, Yes, because you've got this, it means that you're sicker than – than something else. So the – it's a very nonpredictive tool. Okay?
>
> And the other important thing says, While SIRS remains a useful concept, the diagnostic criteria for SIRS

21

published in 1992 are overly sensitive and nonspecific. It's just like I've been saying. You – you – how you use that information is – is so hard. You're – you're taking everything in on your – so sensitive it gets all kinds of – of patients that may not be clinically relevant and labeled as SIRS sepsis. So it's – it's a – it's a useful tool to have this concept of a continuum of sepsis; but it may not be as useful clinically when you're seeing a patient that has some of these findings or all of the findings. You still have to have a lot of other information. It's – it's – it's a piece of information, but it's not a predicting piece of information.

[¶51] Dr. Bernhisel further testified that the definition of sepsis that he finds useful in the clinical setting is termed "clinical sepsis," which he explained is the same as "severe sepsis" on the SIRS plus infection sepsis continuum. Plaintiff objected to all of this testimony on the ground that it was not designated in Dr. Bernhisel's expert designation and amounted to unfair surprise.

[¶52] On the question of whether Dr. Bernhisel's opinions were disclosed in his expert designation, defense counsel agreed at trial that Dr. Bernhisel's designation did not reference the SIRS plus infection definition of sepsis or Dr. Bernhisel's opinions concerning the clinical value of the definition. Defense counsel also pointed out, however, that Plaintiff's expert designation for Dr. Haftel did not disclose that he would advocate the SIRS plus infection definition of sepsis or that he would opine that any patient that presents with symptoms meeting that definition of sepsis must be hospitalized. Our review of the expert designations for Drs. Haftel and Bernhisel confirms that neither designation addressed these opinions. Plaintiff's designation of Dr. Haftel did not attach an expert's report, and instead specified that Dr. Haftel would testify to facts and matters contained in his deposition should one be taken. The designation further provided, in relevant part:

> Dr. Haftel is expected to testify as to his conclusions relating to the care and treatment provided to Connie Scribner while at the Emergency Department of the Wyoming Medical Center and under the care of emergency room physician, Dr. Beyer. He is expected to testify that Dr. Beyer's care fell below the accepted standard of care and that his failures ultimately led to Connie Scribner's death through a failure to properly treat her diagnosed bilateral pneumonia and failure to secure her admission to the hospital. * * * Based upon her presentation at the emergency department, her physical signs, blood work, vitals and x-rays she met admission requirements and should have been admitted to the hospital for care and

follow-up treatment. By failing to seek admission, Dr. Beyer's care fell below the standard of care.

[¶53] Defendants' designation of Dr. Bernhisel included an attached report that explained Dr. Bernhisel's review of Decedent's condition, treatment and death, set forth his opinion concerning the standard of care and his opinion that Defendants provided care in keeping with that standard, and set forth his opinions as to the cause of Decedent's death, which he did not attribute to Defendants' care. The designation of Dr. Bernhisel further provided, in relevant part:

>Dr. Bernhisel will testify in accordance with the applicable standards of care for emergency medicine physicians. He will testify that the care and treatment provided to Connie Scribner by the defendants met the standard of care.
>
>\* \* \* \*
>
>Additionally, Dr. Bernhisel may testify in rebuttal, on all issues, to any evidence presented by the plaintiff's expert or lay witnesses.

[¶54] The district court ultimately was not concerned with the lack of specificity in Plaintiff's designation of Dr. Haftel's testimony because the court believed that Defendants had received adequate notice of Dr. Haftel's opinions from his testimony in the first trial. Our review of the transcripts confirms the court's recollection. Although not presented in precisely the same manner as in the second trial, Plaintiff during the first trial presented testimony from Dr. Haftel that an emergency room physician should know the SIRS plus infection definition of sepsis and that it was his opinion that if a patient is diagnosed with sepsis, that patient must be hospitalized.

[¶55] Our review of the first trial also revealed, however, that Defendant Dr. Beyer testified during that trial that he does not agree with Dr. Haftel's opinion that any patient who is diagnosed with sepsis using the SIRS plus infection definition must be hospitalized. Dr. Beyer characterized the SIRS plus infection definition as "overly cautious" and "overly broad," and he cited studies that described the definition as a "poor prognostic indicator." The first trial ended in a mistrial before Dr. Bernhisel testified, so we do not of course know whether his testimony would have been along similar lines. Dr. Beyer's testimony was at least some notice to Plaintiff, though, that Defendants intended to challenge the usefulness of the SIRS plus infection definition of sepsis as a predictor of when hospitalization of a patient is required.

[¶56] We need not, however, necessarily resolve the question of the adequacy of Defendants' designation. On appeal, Plaintiff argues the district court abused its discretion in admitting Dr. Bernhisel's testimony because the testimony was an unfair surprise and an irregularity in the proceedings that led to juror confusion. We note, though, that despite Plaintiff's varying characterizations of the defects in the ruling, the prejudice that Plaintiff argues she suffered as a result of the admission all sounds in unfair surprise—specifically, that the undesignated testimony surprised Plaintiff and made effective cross-examination, challenge and impeachment of the evidence impossible. Where the claim is one of unfair surprise, this Court has repeatedly held that "the appropriate response from a surprised party who wishes to counter testimony is a request for a continuance, and the failure to request one precludes a claim of prejudice." *In re MC*, 2013 WY 43, ¶ 48, 299 P.3d 75, 85 (Wyo. 2013) (quoting *Betts v. Crawford*, 965 P.2d 680, 685 (Wyo. 1998)); *see also Parrish v. Groathouse Constr. Co.*, 2006 WY 33, ¶ 15 n.4, 130 P.3d 502, 507 n.4 (Wyo. 2006) ("Since trial counsel did not request a continuance at the time the trial court overruled his objection, the objection of unfair surprise is effectively waived."); *Meyer v. Rodabaugh*, 982 P.2d 1242, 1245 (Wyo. 1999) (failure to request a continuance on the ground of surprise precludes a party from contending on appeal that he was prejudiced).

[¶57] The district court approached the concerns with Dr. Bernhisel's testimony with great caution, and, while the court admitted Dr. Bernhisel's testimony, it also offered Plaintiff the option of taking a continuance at the conclusion of defense counsel's direct examination of Dr. Bernhisel. The court ruled:

> * * * I don't believe the plaintiff was properly advised of [Dr. Bernhisel's testimony]. And so the issue is how do we address that. I'm not going to strike the testimony. I'm certainly not going to declare another mistrial. But I will do this: At the conclusion of Dr. Bernhisel's testimony, I will allow plaintiffs additional time to prepare for cross-examination as they require. And that can be a reasonable time but not later than reconvening the trial Monday morning. So, basically – and I'll have the plaintiffs tell me at the conclusion of the trial, out of the presence of the jury, how much additional time they wish to prepare, later this afternoon, tomorrow morning, tomorrow afternoon, or Monday morning, but not later than Monday morning.
>
> [Plaintiff's Counsel]: Okay.
>
> THE COURT: And that's to give them additional time not only to prepare for cross-examination and do such

24

consultation as they need, if they need some; but in addition, to determine whether they want to present rebuttal testimony.

Now, obviously, I'm not directing that they take additional time, but I'm giving the opportunity to request that.

[¶58]   At 10:39 a.m. on Wednesday, March 27, of the second trial, Defendants completed their direct examination of Dr. Bernhisel.  At 10:50 that morning, Plaintiff's counsel declined the continuance and proceeded with cross-examination of Dr. Bernhisel.  Setting aside the questions of whether Defendants properly designated Dr. Bernhisel's testimony and whether Plaintiff was in fact surprised by Dr. Bernhisel's testimony, Plaintiff not only did not request a continuance but turned down a continuance that could have extended from Wednesday morning to Monday morning.  Under these circumstances, Plaintiff has waived any claim of prejudice related to the asserted surprise of Dr. Bernhisel's testimony concerning the clinical value of the SIRS plus infection definition of sepsis.

### Dr. Bernhisel's Testimony Re: PORT and CURB-65

[¶59]   As noted above, Dr. Bernhisel testified that the PORT and CURB-65 pneumonia severity indices were better predictors of whether a pneumonia patient requires hospitalization and that Dr. Beyer's decision to discharge Decedent was in keeping with the PORT and CURB-65 guidelines.  Plaintiff objected to Dr. Bernhisel's testimony concerning PORT and CURB-65 and its application to Dr. Beyer's discharge decision on the grounds reflected in the following exchange:

> [Defense Counsel]:  * * * And then, also, Your Honor, with the CURB-65, that – like we said before, that was part of Dr. Bernhisel's deposition.  There is over nine pages where Mr. Ulmer asked Dr. Bernhisel how the PORT score and the CURB-65 score are used in the clinical setting.
>
> THE COURT:  Okay.  He didn't object on that ground.
>
> * * * *
>
> [Plaintiff's Counsel]:  My objection with respect to the PORT score was – was that – not that it wasn't designated.  It was.
>
> * * * *
>
> [Plaintiff's Counsel]:   My objection related to 403 and relevance and that it was confusing and misleading because it wasn't something used at the time.  And so it shouldn't be

allowed to the jury to have them make a determination that, oh, Dr. Beyer was thinking all of the right things when he made his decisions, because he didn't use it. So that is – that is the objection on the PORT score.

[¶60] The district court allowed Dr. Bernhisel's testimony over Plaintiff's objection, as follows:

First of all, I'm going to allow Dr. Bernhisel – Bernhisel – if I'm pronouncing it correctly – to testify regarding the PORT scores. I understand that it is an after-the-fact test that is being used to say that his clinical judgment was correct. And if the – I think that can be brought out clearly on cross-examination. And if the plaintiffs want an instruction to that effect, then they should draft that informally, and I'll give that. That takes care of that issue.

[¶61] Before the jury began their deliberations, the court gave Instruction No. 24, which instructed the jury on the PORT and CURB-65 testimony:

There has been testimony about PORT scores and CURB 65 scores during this trial. These are methods sometimes used to analyze pneumonia symptoms. Testimony concerning these methods is not intended to say that Dr. Beyer properly applied such methods in his care and treatment of Connie Scribner and the testimony shall not be considered by you as such. The weight of this testimony concerning these methods is for you to decide.

[¶62] During Dr. Bernhisel's testimony, Plaintiff further objected to testimony concerning CURB-65, and in particular Dr. Bernhisel's testimony concerning Decedent's BUN levels, on grounds that the testimony called for speculation and was outside Dr. Bernhisel's designation. The court again overruled Plaintiff's objection.

[¶63] On appeal, Plaintiff instead argues that the CURB-65 testimony, by both Dr. Beyer and Dr. Bernhisel, was a "well organized and preconceived ambush." Plaintiff further argues that Dr. Bernhisel lacked expertise in application of CURB-65 and she was precluded in showing this through cross-examination because of the surprise nature of the testimony. Regarding the surprise nature of Dr. Bernhisel's testimony, Plaintiff argues on appeal:

Dr. Bernhisel's report does make mention of the existence of CURB-65 as such a metric but does not discuss it

26

in the body of his report or in his deposition.  At the time, he was more taken with the PORT Score criteria that he presumably had to abandon because Dr. Beyer had not done enough of the lab tests to obtain a score for Connie Scribner.

[¶64]  Our review of the record indicates that Dr. Bernhisel did in fact discuss CURB-65 in his deposition.  During his deposition taken by Plaintiff's counsel, Dr. Bernhisel testified, in part:

> Q.  * * * Is there any lab or study that can be done that would give the emergency room doctor an understanding of the severity of the pneumonia?
>
> A.  Well, your clinical judgment's probably one of the critical things, but we do have some guidelines that have been drawn up and studied that look at that that give us some information that we can use, in addition to our clinical judgment, to determine how we treat these patients and who can we treat as an inpatient, who do we treat as an outpatient.  So we do have some guidelines that we use on a regular basis.
>
> Q.  Are those like the pneumonia severity indexes?
>
> A.  The two that we use the most are the PORT score and the CURB-65.  Those are the two that – at the University of Utah, and I believe nationally, are used probably of the most frequently for pneumonia.

[¶65]  This testimony by Dr. Bernhisel was followed by several pages of further examination by Plaintiff's counsel concerning CURB-65 and PORT.  Dr. Bernhisel's testimony concerning PORT and CURB-65 was therefore in keeping with his expert designation.  We therefore find no abuse of discretion in the district court's admission of Dr. Bernhisel's testimony. [2]

_____

[2] Additionally, we note again that even if Plaintiff was surprised by Dr. Bernhisel's testimony, Plaintiff failed to request a continuance.  Thus, Plaintiff's claims of prejudice relating to the alleged surprise testimony, namely an inability to effectively impeach and confront the testimony, are waived by her failure to request a continuance. *See In re MC*, ¶ 48, 299 P.3d at 85.  Finally, although Plaintiff argues jury confusion as a result of the district court's rulings on Dr. Bernhisel's testimony, those claims likewise seem to stem from unfair surprise and the resulting inability to properly confront Dr. Bernhisel's testimony.  They do not stem from the ground argued at trial that the testimony regarding PORT and CURB-65 was confusing and misleading because Dr. Beyer used neither guideline in treating Decedent and making his discharge decision.  Certainly, Plaintiff has presented no argument on appeal as to how the district court's instruction was in any way inadequate to address the concerns related to Dr. Beyer's

**b.     Dr. Beyer's Testimony**

[¶66] As noted above, Defendant Dr. Beyer testified that application of the CURB-65 criteria to Decedent's symptoms on October 20 supported his discharge decision. This testimony occurred during Plaintiff's direct examination of Dr. Beyer in her case in chief. Plaintiff's counsel asked the first question regarding CURB-65 early in his direct examination of Dr. Beyer.

> Q.  And do you remember [Defense Counsel] was asking Dr. Haftel about the CURB-64 [sic]?  Do you remember him asking that?
>
> A.  Yes.
>
> Q.  And that's a – kind of a pneumonia severity index; correct?
>
> A.  That is correct.
>
> Q.  And you don't use pneumonia severity indexes in your practice; correct?
>
> [Defense Counsel]:  Actually, I asked him about CURB-65.
>
> [Plaintiff's Counsel]:  Thank you.  CURB-65.
>
> Q.  You don't – the CURB-65 is a pneumonia severity index; correct?
>
> A.  Correct.
>
> Q.  And you don't use pneumonia severity indexes in your practice; correct?
>
> A.  Not – not very often; that is true.

[¶67] The next day, during his continuing direct examination of Dr. Beyer, Plaintiff's counsel asked Dr. Beyer about his ability to determine how Decedent's body was functioning internally without performing tests, and the following exchange occurred:

---

use or non-use of the guidelines in making his discharge decision.  We therefore do not give that claim any further consideration.

Q. And those things are things that you can't tell just by looking at somebody; true?

A. True.

Q. Okay.

A. But there are – there are a set of – of prognostic criteria set forth that give you – that predict mortality for community-acquired pneumonia.

Q. Now –

A. The CURB-65. The CURB-65.

Q. Perfect. Perfect. Let's talk about that again, because I want to go back to that. And I would like to –

[THE COURT]: [Plaintiff's Counsel], before we start a new topic, I wonder if this would be a good time for a break.

* * * *

Q. Okay. Right before we took a break, you mentioned that there is other prognosticators, like the CURB-65; correct?

A. Correct.

Q. But yesterday when we talked, you said that you didn't use the CURB-65 when you were treating Connie Scribner. Do you recall that testimony?

A. Correct.

Q. All right. And that's true; correct?

A. Correct.

Q. And that you don't use at all in your practice any kind of pneumonia severity index; true?

A. Correct.

29

[¶68] Defendant Dr. Beyer also testified to the following on direct examination by Plaintiff's counsel:

Q. But in terms of recognizing problems – and you're talking about pneumonia – but the problems that are associated with sepsis, those are problems that require medical monitoring that cannot be done by the average person at home; correct?

A. Correct.

Q. Right.

And that is why, when somebody presents in the emergency department with a bilateral pneumonia and sepsis, they are not sent home; they are admitted to the hospital –

A. That is not –

Q. -- where they are monitored?

A. That is not always the case. It's not.

Q. It's not what you did?

A. It's not what I did. My – that is correct. My judgment was to discharge her. And there are – you know, there are good studies showing that that is appropriate in some cases. And she qualifies actually as one of those patients that can be given a safely discharged home to be monitored.

Q. Well, okay.

The studies that you just referenced saying that she was somebody who could be safely sent home to be monitored, those aren't studies that you had available to you, consulted with, looked at, considered when you made the decision to take and send Connie Scribner home; correct?

A. That is true. They do confirm my clinical impression at the time of discharge.

[¶69] During cross-examination by defense counsel, Dr. Beyer testified as follows, without objection:

> Q. [Plaintiff's Counsel] was talking to you about what appears to be a continuum, an ongoing study of individuals with pneumonia and the relationship that that pneumonia has to sepsis and severe sepsis.
>
> A. Yes.
>
> Q. Why is there such a continual amount of attention paid to that particular subject?
>
> A. Because it's – you know, it's a very frustrating thing to treat. It is – we're constantly trying to come up with new ways to treat it better and diagnose it. And so there is a lot of research going on in this – in this field.
>
> Q. In the field, what has been the result of this definition?
>
> A. This definition has been shown to be, again, overly broad; and particularly in the case of community-acquired pneumonia, the CURB-65 criteria have been shown compared to SIRS plus sepsis, that those – that those exact symptoms – or symptom complexes and the studies have been done comparing the two in terms of prognosis. And the CURB-65 trial has been – has shown that the CURB-65 is much better at predicting mortality and outcome in community-acquired pneumonia as opposed to using the SIRS plus sepsis more general criteria.
>
> Q. SIRS plus sepsis, does that result in a large number of unnecessary admissions?
>
> A. Yes, it does.
>
> Q. And so to cut down on the unnecessary admissions, you identify the dangerous cases. Is that the reason for the study?
>
> A. Yes. They were trying to – this was in the journal *Thorax* from the Britain's thoracic society, and it's a – they found that – that was one of their purposes, was to compare a lot of the – the symptom complexes and symptoms to try to figure out

31

what is the best way to –to find that balance between treating – you know, admitting appropriately too often versus discharging folks you don't want to discharge. And, actually, that study showed that the CURB-65 criteria are better at both predicting those patients that are going to get worse and is also better at predicting those that are going to – are not going to – are – are going to get better that the SIRS plus an infection.

[¶70] On continued cross-examination by defense counsel, Dr. Beyer testified concerning application of the CURB-65 criteria, including his conclusions concerning Decedent's blood urea nitrogen level as it related to the "U" in the CURB-65 analysis.

Q. All right. And the urea would be the BUN that we just discussed?

A. Would be the BUN, correct.

Q. Connie's BUN when she presented in full cardiac arrest at the emergency room was normal?

A. It was normal.

Q. And so what does that tell you what it would have been 24 hours before that?

A. It would be normal.

[Plaintiff's Counsel]: Object; calls for speculation.

THE COURT: Well, wait.

[Defense Counsel]: I was going to clear up the speculation if I could.

Q. Can you make an extrapolation based upon your education, training, and experience about whether a normal urea on the day that she is in cardiac arrest would be normal 24 hours before that?

A. Yes. In theory –

32

[Plaintiff's Counsel]: Your Honor, I'm going to offer an objection. If he wants to talk about it, I guess during the direct, that's fine. But this is beyond the scope of my cross. And I think that we're getting into an area that's also never been designated from the witness.

THE COURT: Was this witness designated as an expert? I can't remember.

[Defense Counsel]: Well, Your Honor, he's the defendant in the case.

THE COURT: I know.

[Defense Counsel]: And he –

THE COURT: Does he have to be designated?

[Defense Counsel]: Well, I haven't designated him as an expert witness, but –

THE COURT: You may ask the question. Go ahead.

Q. Can you extrapolate 24 hours before that?

A. Yes. I mean, if this – if Connie, when she arrived in the hospital on the 21st, was – had – unconscious, was having CPR done, if this would have been due to severe septic shock, the BUN creatinine should be abnormal. And so if it was normal when she was in this much extremis, then you can pretty much assuredly say it was normal the previous day.

[¶71] On redirect examination by Plaintiff's counsel, the following exchange took place:

Q. You had mentioned this article from *Thorax*. Do you recall that, the British magazine?

A. Yes.

Q. When did you review that?

A. In the last few days.

33

Q.   Okay.  And so you hadn't reviewed the article about *Thorax* and CURB-65 and its relation to SIRS and its relation to sepsis at any time prior to your treatment of Connie Scribner; correct?

A.  Correct.

Q.  And, in fact, we talked about the fact that the CURB-65 is not even something that you use; correct?

A.  Correct.  It does –

THE COURT:  Wait a minute.

Q.  Just a second.

[Plaintiff's Counsel]:  Your Honor, I think that I would move to strike any testimony about the BUN and the CURB-65, anything directing the *Thorax* article as having been undesignated testimony.  He's offering it as an expert witness, and it's never been designated.

[Defense Counsel]: Your Honor, he is simply defending himself in a medical malpractice case.  And I think that that information is relevant.  He's entitled to do his research of the literature in his own defense, and that's what he did.

THE COURT:  I will not strike the testimony.

[¶72]  The Court did not strike the testimony, but Plaintiff's counsel was permitted the opportunity to review the *Thorax* article and examine Defendant Dr. Beyer concerning the article when Dr. Beyer was called during Defendants' case.  After additional testimony on redirect examination of Dr. Beyer by Plaintiff's counsel, Plaintiff's counsel again objected to Dr. Beyer's testimony concerning CURB-65 and moved to strike the testimony:

[Plaintiff's Counsel]:  Your Honor, once again, I would move to strike the testimony regarding CURB-65 because it is not something that he used in his care and treatment of Connie Scribner; and to talk about it as justification for his care and treatment now is confusing and highly prejudicial, and it shouldn't be something that the jury would have to – to wade through in their deliberations.

34

[¶73] The court again overruled Plaintiff's objection and denied the motion to strike. The court then gave the following instruction to the jury:

> I'm going to instruct the jury that the doctor is not testifying that he relied upon this CURB-65 or the CRB-65 when he made his decision to discharge Ms. Scribner. That is not the basis for his testimony. He is only saying that it confirms that what he did was right. Now, that is ultimately your decision, but you are to consider testimony on this CURB-65 only for that limited purpose.[3]

[¶74] On appeal, Plaintiff argues that the district court abused its discretion in admitting Dr. Beyer's testimony concerning CURB-65 and Decedent's BUN levels because 1) the testimony was undesignated expert testimony that unfairly surprised Plaintiff; and 2) the testimony misled and confused the jury concerning the standard of care. We disagree that Dr. Beyer's testimony should have been excluded as undesignated expert testimony, and we also reject Plaintiff's contention that the testimony should have been excluded as misleading or confusing.

[¶75] Rule 26(a) of the Wyoming Rules of Civil Procedure did not require designation of Defendant Dr. Beyer's testimony. Rule 26(a) provides, in relevant part:

> (2) Disclosure of expert testimony.
>
> (A) In addition to the disclosures required by paragraph (1) or (1.1), a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Wyoming Rules of Evidence.
>
> (B) Except as otherwise stipulated or directed by the court, this disclosure shall, *with respect to a witness who is retained or specially employed to provide expert testimony* in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness or disclosure signed by counsel for the party. The report or disclosure shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any

---

[3] This instruction is in addition to the earlier-referenced written instruction the court read to the jury before it began its deliberations.

35

exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

(C) These disclosures shall be made at the times and in the sequence directed by the court. In the absence of other directions from the court or stipulation by the parties, the disclosures shall be made at least 90 days before the trial date or the date the case is to be ready for trial or, if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under paragraph (2)(B), within 30 days after the disclosure made by the other party. The parties shall supplement these disclosures when required under subdivision (e)(1).

W.R.C.P. 26(a)(2) (emphasis added).

[¶76]   Defendants' expert witness designation stated that "Defendants reserve the right to elicit expert testimony from treating physicians to the extent that those physicians have opinions within their fields of expertise which relate to the issues of liability and causation in this case."  Defendants thus identified Defendant Dr. Beyer as a witness who "may be used at trial to present evidence under Rules 702, 703, or 705 of the Wyoming Rules of Evidence," as required by Rule 26(a)(2)(A).  Beyond that, no further designation was required.   Rule 26(a)(2)(B), by its plain terms, applies to witnesses retained or specially employed to provide expert testimony in a case.  Dr. Beyer was neither.  He was a defendant, not an expert retained or employed to provide testimony.

[¶77]  Moreover, we have held that a party cannot seek to exclude evidence when he "opens the door" to inquiry about it.  *See Roden v. State*, 2010 WY 11, ¶ 14, 225 P.3d 497, 501 (Wyo. 2010); *Lawrence v. State*, 2007 WY 183, ¶ 14, 171 P.3d 517, 521-22 (Wyo. 2007). Plaintiff's counsel called Dr. Beyer as a witness in Plaintiff's case-in-chief and explored all manner of opinion testimony including the definition of sepsis, the requirement that a physician know how to identify sepsis, the progression of sepsis, rules an emergency room physician must follow in treating any patient, and the standard of care as to when a pneumonia patient must be hospitalized.  Additionally, as to Decedent's BUN level, Plaintiff's counsel asked Dr. Beyer how he could know how Decedent's bodily functions were performing, such as her kidneys, without having requested the specific lab tests on the date he saw her in the emergency room.  Plaintiff's counsel asked a similar line of questions concerning how Dr. Beyer could know whether there were any

36

signs or symptoms of severe sepsis if he had not requested the specific lab tests when he saw her. Having opened the door to Dr. Beyer's opinions, Plaintiff was not in a position to seek exclusion of the relevant testimony.

[¶78] Finally, on the question of unfair surprise, the district court made allowances for Plaintiff's counsel to review the article relied upon by Dr. Beyer in his testimony, and gave him leeway to further examine Dr. Beyer on the article when Dr. Beyer was called in Defendants' case. At trial, Plaintiff's counsel commented on that relief, stating, "I would say that – Your Honor, that Dr. Beyer talked about CURB-65 being a better predictor of mortality than SIRS. And I'm aware of that. And I had the weekend to read it. And I am prepared on that." It is apparent that to the extent Plaintiff felt blind-sided by Dr. Beyer's CURB-65 testimony, the court adequately addressed that issue at trial. To the extent that Plaintiff asserts any further prejudice as a result of unfair surprise, such as the ability to impeach Dr. Beyer's reliance on a particular article or the ability to fully confront Dr. Beyer's extrapolation of BUN values and the significance of those values, we find these claims to be waived by Plaintiff's failure to request a continuance. *See also Parrish*, ¶ 15 n.4, 130 P.3d at 507 n.4 ("Since trial counsel did not request a continuance at the time the trial court overruled his objection, the objection of unfair surprise is effectively waived.").

[¶79] We turn last to Plaintiff's argument that Dr. Beyer's testimony should have been excluded as misleading and confusing to the jury on the question of the standard of care. In making this argument, Plaintiff cites to Wyo. Stat. Ann. § 1-12-601, which sets forth a plaintiff's burden of proof in a medical malpractice action. In particular, the provision requires that a plaintiff prove that the defendant physician "failed to act in accordance with the standard of care adhered to by that national board or association." Wyo. Stat. Ann. § 1-12-601(a)(i) (LexisNexis 2013). Based on this provision, Plaintiff argues that Dr. Beyer's testimony was confusing and misleading because the testimony advocated for a standard of care that was not followed by Dr. Beyer and was based on a study published in 2006, after Dr. Beyer's treatment and discharge decisions in the care of Decedent.

[¶80] Plaintiff's argument is flawed for the fundamental reason that it attempts to shift the burden of proof. In a medical malpractice action, it is clear that a plaintiff carries the burden of establishing: 1) the standard of care; and 2) that the defendant physician deviated from that standard of care. *Id.*; *Witherspoon v. Teton Laser Center, LLC,* 2007 WY 3, ¶ 16, 149 P.3d 715, 726-27 (Wyo. 2007). A defendant is not required to establish the standard of care.

[¶81] In this case, Plaintiff asserted that the definition of sepsis is SIRS plus infection and that the standard of care required hospitalization of any pneumonia patient meeting that definition. The studies cited by Dr. Beyer, and by Dr. Bernhisel, showed that the standard of care asserted by Plaintiff was not supported by studies of pneumonia patients and their responses to sepsis. The studies otherwise showed that other guidelines are

better predictors of mortality among pneumonia patients. That evidence was relevant to rebut Plaintiff's proffered standard of care. Dr. Beyer's testimony, again echoed by Dr. Bernhisel, was not that Dr. Beyer followed the alternative guidelines, but rather that his exercise of clinical judgment was consistent with these guidelines. This too was relevant to rebut Plaintiff's evidence that Dr. Beyer deviated from the standard of care.

[¶82] The district court's repeated instructions to the jury that testimony concerning alternative guidelines was not testimony that Dr. Beyer followed those particular guidelines adequately guarded against any confusion that could arise from either Dr. Beyer's or Dr. Bernhisel's testimony. We find no abuse of discretion in the admission of Dr. Beyer's testimony concerning CURB-65 or Decedent's extrapolated BUN levels.

## CONCLUSION

[¶83] The district court did not abuse its discretion in declaring a mistrial or in admitting the testimony of Defendant Dr. Beyer and Defendants' emergency medicine expert specified in Plaintiff's statement of her issues on appeal. Affirmed.